*Attorney Grievance Commission v. Christal Elizabeth Edwards*, Misc. Docket AG No. 16, September Term, 2016; Misc. Docket AG No. 21, September Term, 2017

**ATTORNEY MISCONDUCT — DISCIPLINE — DISBARMENT —** Respondent Christal Elizabeth Edwards violated Maryland Lawyers' Rules of Professional Conduct 1.1, 1.2, 1.3, 1.4, 1.5, 1.15, 1.16, 3.4, 8.1, and 8.4. These violations arose from Respondent's pattern of neglecting her clients' cases; failing to properly maintain client funds in her attorney trust account; and making material misrepresentations to clients, opposing counsel, the Office of Bar Counsel, and the courts. Disbarment is the appropriate sanction for Respondent's misconduct.

IN THE COURT OF APPEALS
OF MARYLAND

Misc. Docket AG No. 16
September Term, 2016

&

Misc. Docket AG No. 21
September Term, 2017

ATTORNEY GRIEVANCE COMMISSION
OF MARYLAND

v.

CHRISTAL ELIZABETH EDWARDS

Barbera, C.J.,
Greene
McDonald
Watts
Hotten
Getty
Adkins, Sally D.,
   (Senior Judge, Specially Assigned)

JJ.

Opinion by Barbera, C.J.

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Filed: February 26, 2019

Suzanne C. Johnson, Clerk

Petitioner, the Attorney Grievance Commission of Maryland, acting through Bar Counsel, filed in this Court two Petitions for Disciplinary or Remedial Action against Respondent, Christal Elizabeth Edwards, regarding six separate complaints filed against her by former clients and a stenographer formerly employed by Respondent. Bar Counsel moved to consolidate the two petitions and we granted that motion. The petitions allege violations of the Maryland Lawyers' Rules of Professional Conduct[1] ("MLRPC") 1.1 (Competence), 1.2 (Scope of Representation), 1.3 (Diligence), 1.4 (Communication), 1.5 (Fees), 1.15 (Safekeeping Property), 1.16 (Declining or Terminating Representation), 3.3(a) (Candor Toward the Tribunal), 3.4(c) (Fairness to Opposing Party and Counsel), 5.5(a) (Unauthorized Practice of Law; Multijurisdictional Practice of Law), 7.1(a) (Communications Concerning a Lawyer's Services), 8.1(b) (Bar Admission and Disciplinary Matters), and 8.4(a), (c), and (d) (Misconduct).[2]

On June 29, 2016, this Court transmitted this matter to the Circuit Court for Montgomery County and designated the Honorable Nelson W. Rupp, Jr., ("the hearing judge") to conduct an evidentiary hearing and make findings of fact and conclusions of law. The hearing took place on February 20-23, 2018, and April 16, 2018. At the hearing, the judge heard testimony from Respondent and ten witnesses (seven for Petitioner and

---

[1] Effective July 1, 2016, the Maryland Lawyers' Rules of Professional Conduct ("MLRPC") were renamed the Maryland Attorneys' Rules of Professional Conduct ("MARPC") and recodified without substantive changes in Title 19 of the Maryland Rules. Respondent's alleged misconduct occurred both before and after the recodification. Because the majority of Respondent's misconduct took place prior to the recodification, we will refer to the MLRPC throughout this opinion.

[2] Bar Counsel subsequently withdrew the charges relating to MLRPC 1.15(d) and (e), 3.3, 5.5(a), and 7.1(a).

three for Respondent). The hearing judge precluded Respondent from introducing evidence regarding her record-keeping for two of her clients, as Respondent had failed to satisfy Bar Counsel's discovery request for those documents prior to the hearing.

We adopt in large part the hearing judge's proposed findings of fact and conclusions of law. Based on the rule violations that Respondent committed, as well as the aggravating and mitigating factors we have identified, we disbar Respondent.

## I.

## The Hearing Judge's Findings of Fact

We summarize here the hearing judge's findings of fact, which are supported by clear and convincing evidence.

*Background*

Respondent was admitted to the Maryland Bar in 2007 and the United States District Court for the District of Maryland in 2009. She was subsequently admitted to the United States District Court for the District of Columbia in 2010 and the District of Columbia Bar in 2013. At all relevant times, Respondent maintained an office at 8403 Colesville Road, Suite 1100, Silver Spring, Maryland ("Colesville Road Office"). Respondent listed the Colesville Road Office with the Client Protection Fund of the Bar of Maryland. Respondent also currently maintains an office at 9701 Apollo Drive, Suite 301, Largo, Maryland ("Apollo Drive Office").

Respondent suffers from ulcerative colitis, which is a "chronic ulceration in the large intestine, characterized by painful abdominal cramps and profuse diarrhea containing pus, blood, and mucus." *Ulcerative Colitis*, Dictionary.com [https://perma.cc/DB3A-

NCUB]. Respondent was diagnosed in 1999 and testified that although the disease can be manageable, she occasionally experienced what she called "flare ups." These "flare ups" caused Respondent to be hospitalized six times between 2015-2016: (1) March 12-31, 2015; (2) August 27-30, 2015; (3) September 13-20, 2015; (4) October 11-16, 2015; (5) December 27-30, 2015; and (6) January 20-February 4, 2016. The hearing judge credited Respondent's claim that she received care through doctor visits and "two to three-hour 'infusion appointments' from October 6, 2011 through May 19, 2016."[3]

*Representation of Rochell Richardson*

In late January 2010, Rochell Richardson entered into a contract with Capitol Improvement Contractors, Inc. ("Capitol") to rehabilitate her family home. The contract was financed through a City of Baltimore ("City") "'203k' home rehabilitation program" and required disputes under the contract to be resolved through arbitration "under the auspices of the Better Business Bureau, Inc."

Seven months later, after demolishing "substantial portions of the home," and causing the water in Ms. Richardson's home to run continuously, Capitol stopped working due to, what it called, "unforeseen conditions." As a result, Ms. Richardson filed a *pro se* complaint against Capitol with the Maryland Department of Labor, Licensing and Regulation ("DLLR"). The complaint alleged that Capitol had left Ms. Richardson's home unsafe and in a state of disrepair. Her complaint was sent to the Better Business Bureau per the arbitration clause of the contract.

---

[3] The record developed at the hearing led the hearing judge to reject all of Respondent's testimony save the above-referenced appointments and hospitalizations.

On February 2, 2011, the Environmental Control Board of Baltimore City issued an Environmental Citation to Ms. Richardson due to the condition of her home. Later that same month, the City sent Ms. Richardson an invoice for a delinquent water bill totaling $2,106.59.

Ms. Richardson's niece, Alisa Boddie, who acted as an intermediary throughout this matter, introduced Ms. Richardson to Respondent. In early October 2011, Ms. Richardson retained Respondent on a contingent fee basis to represent her in an "Arbitration and Civil Suit involving Capitol Improvement Contractors, LLC and Baltimore Housing Authority."

In December 2011, the City declared Ms. Richardson's home uninhabitable. Ms. Richardson was forced to move out later that month.

On March 4, 2012, Respondent sent a "Demand Letter for Arbitration Hearing" to the Office of Rehabilitation. On March 23, 2012, Respondent sent a similar demand letter to the Better Business Bureau. No hearing was scheduled and nothing in the record suggests that Respondent followed up on either letter.

The following month, the Baltimore City Bureau of Revenue Collections sent a "Tax Sale Notice" to Ms. Richardson. At that point, Ms. Richardson learned that the City had placed a tax lien on her home because of the delinquent water bill. A tax sale was scheduled to occur on May 21, 2012.

On the day of the tax sale, Respondent wrote to the Bureau of Revenue Collections stating that the water bill was part of a lawsuit.[4] Two days later, Capitol filed a breach of

---

[4] The hearing judge did not make a finding regarding what happened to the home, but unrefuted evidence reveals that Ms. Richardson ultimately lost her family home and,

4

contract action against Ms. Richardson.

Respondent then assured Ms. Richardson that arbitration was unnecessary and that she would file a lawsuit against Capitol. Respondent, however, never sent a letter of representation or a demand letter to Capitol. Nor did Respondent file a lawsuit on Ms. Richardson's behalf, correspond with Capitol, or enter her appearance in Capitol's lawsuit against Ms. Richardson.

In November 2014, Respondent advised Ms. Richardson that she was working on Ms. Richardson's case and that after the holidays, her case would be Respondent's "first priority." The hearing judge found that Respondent misled Ms. Richardson (and Ms. Boddie) by communicating that she would continue to work on Ms. Richardson's case.

On July 6, 2015, after receiving no communications from Respondent for over six months, Ms. Boddie requested, on Ms. Richardson's behalf, that Respondent call her to discuss the case. Respondent informed Ms. Boddie and Ms. Richardson, for the first time, that she had been in the hospital and "out sick right after the holidays and just returned to work full time about two weeks ago." The hearing judge found that between January and July 2015, Respondent took no action to protect the interests of Ms. Richardson. Respondent's medical records reflect a hospitalization from mid to late March, but nothing "right after the holidays" or "about two weeks" before July 6, 2015.

By July 25, 2015, Respondent still had not taken any action in Ms. Richardson's case, prompting Ms. Richardson to file a complaint with the Attorney Grievance

---

apparently, Respondent's letter seems to have had no effect on Ms. Richardson's attempts to save her ownership of the home.

Commission. In over three years, Respondent's representation of Ms. Richardson consisted of nothing more than the three letters sent to the Baltimore City Office of Rehabilitation, the Better Business Bureau, and the Baltimore City Bureau of Revenue Collections.

*Representation of Brenda Dyer*

In November 2012, Brenda Dyer was injured during a "Black Friday" event at a Walmart in Collierville, Tennessee. A group of customers, while rushing a display, knocked Ms. Dyer over and trampled her. Ms. Dyer suffered injuries to her leg and back. Respondent's sister, who worked with Ms. Dyer, referred Ms. Dyer to Respondent.

On December 12, 2012, Ms. Dyer hired Respondent on a contingent fee basis. Respondent told Ms. Dyer that they would wait to file a lawsuit until Ms. Dyer's medical treatment was complete and her doctors "cleared" her.

On December 23, 2012, Ms. Dyer sent Respondent the following email:

> The [doctor] has set me up for [an] MRI on January 2nd for my back and knee. My back ha[s] degenerative disc disease at L5 Sl. I thought you should know that info. Have you talked to Walmart at all [o]r are you waiting for me to get their determination [o]f fault letter?

Respondent did not respond.

Three days later, Ms. Dyer again emailed Respondent, stating:

> Please call me when you are available so that we can meet up and discuss the case. I have not heard anything from them in reference to their decision about who was at fault yet.

Respondent did not respond.

A month later, Ms. Dyer emailed Respondent yet again, stating, in pertinent part:

6

My parents suggested I send you an email because you are probably busy. I had left you a message a couple weeks ago letting you know that the claims agent from Walmart had attempted to call me and I did not answer the call because you had stated you would do the talking with them instead of me. I was wondering if you were able to get ahold of them? I am just curious because the MRI bill will be coming in soon and I truthfully do not have the money to pay for it because it went towards my deductible. I already owe my doctor[']s office additional monies because they have charged additional for me when they had drained my knee and they were charging me incorrectly for the therapy sessions. Please let me know what I should do or if Walmart has agreed that it was their fault.

On the same day, Respondent replied:

Yes, you are correct in not speaking with Walmart. I left a message and sent my letter of representation to them. I will give them a call on Monday and follow up with you then.

When Respondent sent this email, she in fact had not left a message, sent a letter of representation, or had any correspondence with Walmart whatsoever. The hearing judge found this to be a knowing and intentional misrepresentation.

A week after Respondent's email, Ms. Dyer emailed Respondent, asking: "Did you already talk to the insurance guy?" Respondent did not respond.

Eleven days later, Ms. Dyer emailed Respondent the following:

I have to go in for surgery on Monday for my knee, there is a meniscus tear. Have you heard anything from Walmart[?] You had stated previously you would be calling me back but I have not heard anything. I have given it a couple weeks and I have called and left you a message. Please let me know what is going on.

Respondent did not respond.

Over a month later, Ms. Dyer emailed Respondent asking for an update on her case.

Respondent did not respond.

Eleven days later, Ms. Dyer emailed Respondent yet again, this time stating:

I was just wondering if you had heard anything from Walmart yet. It has been over 4 months since it occurred so they have to have said something by now. I am worried if we wait too long the tape will [disappear] from that night.

On April 17, 2013, Respondent sent a letter to Walmart's representative, Claims Management, Inc., stating, in pertinent part:

This letter is to advise that I am the legal representative for [Brenda Dyer] as the result of injuries sustained during an incident while shopping on "Black Friday" at a Wal-Mart store in Collierville, TN.

It is my understanding that [Ms. Dyer] began working with your office over three months ago. Please feel free to contact me at the above address and telephone number for any further information.

Ms. Dyer never received a copy of that letter.

Between September and October 2013, Ms. Dyer sent Respondent at least four text messages relating to her case. On October 4, 2013, having not received a response, Ms. Dyer emailed Respondent stating:

I have sent you text messages on several different occasions. I have sent an email to the [firm's] general email address. I just left a message at the office today. I am getting concerned that I have not heard back from you. My surgery is almost 2 weeks away. Have you heard anything? I am concerned that I have not heard from you and wonder if everything is ok on your end or if I need to find another attorney. Please let me know so I will know how to proceed.

On November 22, 2013, the statute of limitations for Ms. Dyer's claim in Tennessee expired with no suit having been filed.

In April 2014, approximately five months after the statute of limitations had run, Respondent informed Ms. Dyer, for the first time, that Walmart denied liability for her injuries. Respondent then told Ms. Dyer that she would pursue a lawsuit against Walmart

8

in Arkansas.[5]

On May 23, 2014, Ms. Dyer sent a text message to Respondent asking whether she had filed the complaint or retrieved the surveillance footage. Respondent did not respond.

Nine days later, Ms. Dyer sent another text message to Respondent, asking, "Is the lawyer in Arkansas going to file?" Respondent replied, "Yes." The hearing judge found that this was a knowing and intentional misrepresentation because there was no evidence that Respondent had "made any arrangements to file a claim . . . in either Tennessee or Arkansas."

On June 5, 2014, Ms. Dyer again sent Respondent a text message following up on her questions from May 23, 2014. Respondent did not respond. On June 11, 2014, Ms. Dyer sent a text message to Respondent terminating Respondent's representation.

Respondent never filed a lawsuit or coordinated with local counsel to have a lawsuit filed in either Tennessee or Arkansas. On August 14, 2015, Ms. Dyer filed a complaint with the Attorney Grievance Commission.

*Outstanding Invoices—Marguerite D. Keller*

In July 2013, Respondent hired Marguerite Keller as a stenographer in connection with her representation of a client. Respondent failed to pay three separate invoices totaling more than $1,400. On September 2, 2014, Ms. Keller filed a complaint with the Attorney Grievance Commission.

---

[5] The record reflects that Respondent told Ms. Dyer she would file suit in Arkansas because Walmart's headquarters is located there.

9

*Representation of LaTasha Houston*

*Initial Work*

On March 30, 2014, LaTasha Houston, who sought to modify a child support order, executed a retainer agreement with Respondent. The agreement called for a $1,000 retainer and stated that work would be billed at an hourly rate of $275.00. The following day, Respondent deposited Ms. Houston's $1,000 retainer into her attorney trust account.

After the father of Ms. Houston's child, Mr. Wilson, moved to modify the child support order, a hearing was set for June 10, 2014. Respondent informed Ms. Houston that she would raise Ms. Houston's motion to modify the child support order at the hearing.

On April 28, 2014, Respondent prepared a subpoena for Mr. Wilson's employer, the U.S. Marshals Service, to obtain information regarding his earnings and leave. In preparing the subpoena, Respondent listed the return date as May 1, 2014, i.e., three days later. Twelve days *after* the subpoena's listed return date, Respondent served the subpoena on the Marshals Service via facsimile.

The Marshals Service moved to quash the subpoena, arguing, among other things, that the subpoena was served after its return date. Respondent did not respond to the motion to quash, but instead, told Ms. Houston that they would find a different way of getting Mr. Wilson's financial information.

Respondent attended the June hearing without having filed an opposition to Mr. Wilson's motion to modify the child support order. At that time, Respondent told the court and Mr. Wilson that a motion to modify the child support was forthcoming.

10

After the hearing and in response to Ms. Houston's trepidation about the case, Respondent reassured her that she would draft a motion to modify the child support order within a few days. Ms. Houston then asked if Respondent would file a motion to recuse the judge.[6] Respondent agreed to do so.

Throughout June and July 2014, Ms. Houston sent Respondent multiple emails requesting status updates on the two motions Ms. Houston had requested be filed by Respondent. When Respondent replied, she assured Ms. Houston that the motions were going to be served along with discovery requests.

On June 14, 2014, Respondent propounded interrogatories on Mr. Wilson. When Mr. Wilson did not respond, Respondent failed to compel discovery or otherwise obtain the information sought.

Four days later, Ms. Houston requested to see a document relating to the motion to quash, which the U.S. Marshals Service had filed previously. Ms. Houston also reiterated her concern about the filing of the motion to modify child support and the motion to recuse, stating that Respondent was "three business days behind [the agreed upon] scheduled date."

Respondent reassured Ms. Houston that she would finish the motions. Respondent did not mention the Marshals Service's motion to quash, nor did she provide a copy of the motion to Ms. Houston, as she had requested.

Respondent continued to ignore Ms. Houston and her requests for documents and

---

[6] The record reflects that the motion alleged that the judge who entered the child support order knew Mr. Wilson from Mr. Wilson's time working at the courthouse as a Deputy U.S. Marshal.

11

updates on her case. Consequently, on July 14, 2014, Ms. Houston told Respondent that if the motions were not filed by July 18, 2014, Ms. Houston would be requesting a full refund. Respondent did not respond.

On August 5, 2014, Ms. Houston wrote to Respondent to terminate her representation, request her client file, and demand a full refund of the retainer fee. Roughly two months later, Respondent sent a letter to Ms. Houston (and apparently all her clients), stating:

> I am writing this letter to inform you of my very unforeseen and unfortunate situation. For the past six months I have been dealing with a chronic disease and it has caused me to be extremely ill for the past two months. As a result, I have been unable to fulfill my obligations to you, as my client and the matters of your case. I sincerely apologize. However, by the grace of God, I am currently doing well and back in the office fulltime.
>
> It is my plan to personally contact you during this week, the week of September 29, 2014, to discuss your case and how you want me to proceed. Again, I sincerely apologize for any delay in your matter.

The next day, Ms. Houston replied to Respondent's letter. In it, she again informed Respondent that she was discharging her and wanted her client file and a full refund. Respondent agreed to send the requested refund and informed Ms. Houston that she had asked to be removed from the case. Ms. Houston wished Respondent well and asked when she could expect her file and refund. Respondent did not respond. The hearing judge found that Respondent also "never filed a motion or praecipe to withdraw her appearance from the matter."

On October 8, 2014, Ms. Houston emailed Respondent, stating:

> [I]t has been 7 days since our last communication where you acknowledge[d] receipt of my letter and confirmed that you were sending my refund. If it has

not been done already, being that a week has pas[sed], please send my refund and a copy of my case by 10/15/2014.

I pray all is well with your health.

Respondent did not respond.

*The Lawsuit*

Near the end of October 2014, Ms. Houston filed a lawsuit against Respondent in the District Court of Maryland seeking $1,000 in damages.

On or about October 29, 2014, Respondent called Ms. Houston to inform her that Respondent would not be providing a refund. Ms. Houston once again asked for her refund and her client file. Ms. Houston served Respondent with the District Court complaint and a Writ of Summons on October 31, 2014.

On January 23, 2015, Respondent filed a notice of intention to defend. In the notice, Respondent argued that she did not owe Ms. Houston any money because the retainer fee was earned in full. Respondent then filed a motion to dismiss, or in the alterative, for summary judgment. The motion claimed, among other things, that Respondent was in "constant communication[] with [Ms. Houston]," that Respondent became "gravely ill for several months" after being "assigned" the case, that Ms. Houston was aware of Respondent's illness, and that the "modification hearing did not take place because [Ms.] Houston terminated the services of the Edwards Legal Group." The hearing judge found that Respondent "knowingly and intentionally misrepresented . . . that she was 'in constant

communication' with Ms. Houston."[7]

Approximately six months after Ms. Houston's first request, Respondent provided Ms. Houston with her client file. The client file did not include either a motion for modification of the child support order or a motion to recuse the judge, both of which Ms. Houston had requested be done. The District Court denied Respondent's motion to dismiss or for summary judgment and later ruled in Ms. Houston's favor awarding her $1,000 plus costs.

Insofar as the record reflects, Respondent never returned the retainer fee to Ms. Houston. Respondent never provided an invoice to Ms. Houston during her representation.

*The Billing Records*

As part of Respondent's motion to dismiss Ms. Houston's complaint against her in the District Court, Respondent attached an invoice that she had generated. In comparing the invoice with Respondent's bank records, the hearing judge found that Respondent's invoice was "false." Although Respondent's invoice demonstrated that Respondent

---

[7] The hearing judge found that this misrepresentation was made to Bar Counsel, rather than the District Court. This appears to be an inadvertent oversight by the hearing judge. From our review of the record, Respondent only claimed to be in constant communication with Ms. Houston in her motion to dismiss Ms. Houston's complaint. Bar Counsel obtained the motion through a request to the Clerk of the District Court. Respondent's exception to this finding is not that she never misrepresented this fact to Bar Counsel, but rather, that she was, in fact, in constant communication with Ms. Houston. The record, however, is replete with instances in which Ms. Houston asked Respondent questions and received either no response, an untimely response, or an inadequate response. The court credited Ms. Houston's testimony in that regard. We therefore overrule Respondent's exception and accept the hearing judge's finding that Respondent's statement that she was in constant communication was a knowing and intentional misrepresentation, albeit one made in her motion to the District Court as opposed to Bar Counsel.

14

withdrew Ms. Houston's $1,000 retainer fee on June 30, 2014, bank records reveal that Respondent had in fact disbursed all of Ms. Houston's $1,000 payment by April 14, 2014. Additionally, the hearing judge found that the invoice listed work Respondent had allegedly done on Ms. Houston's motion to modify the child support order and the motion for recusal, but that Ms. Houston's client file did not include either motion.

The hearing judge then seemingly found that *even if* he were to credit the work Respondent listed in her invoice, Respondent disbursed the retainer fee before having earned it in full. Respondent billed at a rate of $275.00 per hour and claims to have performed 3.5 hours of work between March 30, 2014 and May 1, 2014. Because Respondent was only entitled to $962.50 of the $1,000 retainer fee when she made her withdrawal on April 14, 2014, the hearing judge found that Respondent had disbursed the retainer fee before it was earned.[8]

Respondent misled Ms. Houston to believe that she was working on Ms. Houston's behalf and, further, that Respondent sought removal from the case. Lastly, Respondent never explained to Ms. Houston that before she could file a motion for modification of child support, Respondent needed a subpoena of Mr. Wilson's financial information or answers to interrogatories.

In short, Ms. Houston retained Respondent to file a motion for modification of child support and a motion for recusal. Respondent did neither.

---

[8] From our review of the record, Respondent had performed only 1.9 hours of work by April 14, 2014, when she disbursed all of Ms. Houston's retainer fee. Thus, by our calculation, Respondent had earned only $522.50 of the $1,000 retainer when she made her withdrawal.

*Representation of Angela Spencer*

In early 2012, Angela Spencer entered into a contract with Ardekani & Associates ("Ardekani") to renovate her kitchen. After the project was completed, Ms. Spencer withheld full payment because she was dissatisfied with Ardekani's workmanship.

In September 2012, Ardekani filed a breach of contract action in the District Court of Maryland against Ms. Spencer. Ms. Spencer moved to dismiss that action. In March 2013, the District Court dismissed the contractor's complaint and informed Ms. Spencer that she could proceed with a counterclaim against Ardekani. Following the disposition of Ardekani's subsequent appeal, the District Court set trial for November 21, 2014.

On October 9, 2014, Ms. Spencer executed Respondent's retainer agreement and paid half of the $1,500 retainer. The agreement provided that Respondent would represent Ms. Spencer in her "Counterclaim for damages in civil case number 0502-0024756-2012 in Prince George's County, Maryland." The agreement also provided that Respondent would charge $325 per hour.

A week before the trial, Respondent entered her appearance and moved for a continuance. The court granted the motion and postponed the trial until January 27, 2015.

Two months before trial, Ms. Spencer emailed Respondent to ask whether Respondent had contacted Mr. LaValle, Ms. Spencer's expert. Respondent did not respond.

A month later, on January 4, 2015, Ms. Spencer emailed Respondent to schedule a phone call. Respondent replied the following day, stating "I am just getting back in town from the holidays and want to review your case file at the courthouse again. Also, I am

16

going to reach out to Ardekani this week as well. Let's touch base on Thursday [, January 8, 2015]."

On January 13 and 16, 2015, Ms. Spencer asked again whether Respondent was in contact with Mr. LaValle. Respondent did not respond.

On January 26, 2015, the day before trial, Respondent filed an "Application to Inspect Public Records." The court subsequently postponed the matter until April 8, 2015.

On February 16, 2015, Ms. Spencer emailed Respondent requesting an update on her case. Respondent did not respond.

On March 2, 2015, Ms. Spencer reiterated her request for an update. Respondent did not respond.

On March 19, 2015, Ardekani, through its counsel, propounded interrogatories on Ms. Spencer. Ms. Spencer requested that Respondent send her the interrogatories and asked if everything was ready for trial. Respondent did not respond.

Respondent did not inform Ms. Spencer or Ardekani that she was hospitalized between March 12 and 31, 2015. On April 3, 2015, Respondent, without informing Ms. Spencer, filed another motion for a continuance because Respondent was "currently hospitalized." The court granted the motion and rescheduled trial for July 20, 2015.

On April 23, 2015, Ms. Spencer emailed Respondent to ask if there was a new trial date and to request copies of all filings made by either Ardekani or Respondent. Respondent did not respond.

Two months later, Ardekani filed a "Consent Motion for Continuance" due to a scheduling conflict. As a result, the court rescheduled the trial for September 11, 2015.

17

Ardekani also informed Respondent that it would be forced to move for sanctions based on Respondent's failure to provide discovery.

On June 30, 2015, Respondent emailed Ms. Spencer and told her that Ardekani had sent discovery requests while Respondent was in the hospital. Respondent also told Ms. Spencer to answer the interrogatories and that Respondent would review them. Respondent did not mention that Ardekani intended to file a motion for sanctions.

Ms. Spencer sent the completed interrogatories to Respondent on July 8, 2015. Ms. Spencer also provided suggestions to Respondent that Ms. Spencer felt would be appropriate for their interrogatories to Ardekani. It was at this time that Ms. Spencer expressed an interest in settling the case. Respondent, however, never engaged Ardekani in settlement negotiations or sent the interrogatories.

On July 21, 2015, Ms. Spencer asked about the status of her case, whether the interrogatories had been sent to Ardekani, and if Respondent had drafted anything for Ms. Spencer to review. Respondent did not respond.

On August 8, 2015, Ms. Spencer emailed Respondent: "Next court date is about a month away. Are you okay? Would like to hear from you." Respondent replied that she was "back and doing well" and that she had been talking to Ardekani's attorney regarding discovery. Respondent told Ms. Spencer that she would call her that night or the following morning. Respondent never called.

Ardekani's attorney made additional attempts to obtain discovery from Respondent. None were successful. On August 12, 2015, Ardekani moved for sanctions. The hearing judge found that Respondent "failed to inform Ms. Spencer of the Motion for Sanctions,

18

failed to file a response, and failed to provide discovery responses to Ardekani."

On August 19, 2015, Ms. Spencer sent Respondent a package consisting of all her original documents, including Ms. Spencer's answers to the interrogatories. The hearing judge found that although Respondent received the package, she failed to "ever open or review its contents." Throughout August, September, and October 2015, Respondent did not respond to several emails sent by Ms. Spencer.

On September 3, 2015, Respondent filed another motion for continuance. Respondent's motion stated that she was "extremely ill and recovering from a brief hospital stay from August 27 to August 30, 2015." The court obliged and set the hearing for October 14, 2015.

On September 10, 2015, the court granted Ardekani's motion for sanctions and ordered Ms. Spencer to answer discovery by October 15, 2015. Respondent did not inform Ms. Spencer about the Order of Sanctions.

On the date of the hearing, Respondent failed to appear. Earlier that morning, Respondent notified counsel and the court that once again she was hospitalized. During the hearing, the court called Respondent to inform her that the rescheduled hearing would now take place on November 3, 2015.

A few days before the hearing, Ms. Spencer emailed Respondent to ask if she should be available by phone for the pre-trial conference on November 3, 2015. Ms. Spencer again expressed her desire to settle the case. Respondent, who had been out of the hospital for about two weeks, told Ms. Spencer that she did not need to attend the hearing.

On November 3, 2015, neither Ms. Spencer nor Respondent appeared for the

hearing. Ardekani's attorney argued the case should be dismissed because, among other reasons, Respondent had not responded after the request for sanctions. The court agreed and dismissed Ms. Spencer's counterclaim. Respondent did not notify Ms. Spencer of the dismissal or Respondent's failure to appear.

Two days after the hearing, Ms. Spencer emailed Respondent to ask for the outcome of the hearing. Respondent did not respond.

Then, between November 23, 2015 and December 1, 2015, Respondent and Ms. Spencer exchanged the following emails:

November 23, 2015
Ms. Spencer: Court records show dismissal. Was there a settlement?? Please advise.

[Respondent]: I am back out sick but will follow up as soon as possible to let you know what's going on.

Ms. Spencer: I hope "as soon as possible" means this week. I am reachable 24/7.

November 24, 2015
[Respondent]: As I said, I am out sick and will follow up with you as soon as possible.

December 1, 2015
Ms. Spencer: Need to know when we can talk. The hearing was 11/3. If you can't talk, please send whatever documents were issued by the court.

Following Ms. Spencer's December 1, 2015 email, Respondent did not respond or send any documents to Ms. Spencer. On December 4, 2015, Ms. Spencer and Respondent engaged in the following email exchange:

Ms. Spencer: I hope to hear from you this weekend. If not, I will be contacting an attorney to review this situation early next week. Please also return to me immediately all the materials I sent to you in preparation for trial

20

and provide me with copies of any pleadings you received or initiated on my behalf, including from the District Court. I believe I had a right to know if your health situation was so dire as to prevent you from properly representing me.

[Respondent]: Ms. Spencer, I am still out sick and slow to return. If you want another attorney, please feel free. As I told you, I have everything under control.

Ms. Spencer: I need to know what that means ("I have everything under control"). Surely you can explain. I can't imagine that you cannot talk or type to your client advising the status of the matter.

[Respondent]: I AM GETTING READY TO START MY TREATMENT FOR TODAY AND I WILL NOT BE ABLE TO TALK OR TYPE. IF YOU CANNOT WAIT OR IMAG[IN]E THAT[,] THEN LET ME KNOW AND I WILL SEND YOUR FILE TO YOU. I PRAY YOU NEVER GET SICK.

Ms. Spencer: Has the case been dismissed yes or no? What do you have "covered?" How difficult is that to say? I will be praying for you.

Respondent did not reply to Ms. Spencer's last email, nor did she send Ms. Spencer any documents from her client file. Additionally, Respondent's medical records do not support her assertions that she was in the hospital or had appointments on December 4, 2015, or at any time the month prior.

Sometime in early December 2015, Respondent and Ms. Spencer spoke on the phone. Respondent told Ms. Spencer that the "matter would not be dismissed" because "she was in the hospital." Respondent's medical records do not corroborate her claim that she was in the hospital at the time she spoke with Ms. Spencer or when the court dismissed Ms. Spencer's case. Respondent assured Ms. Spencer that she would file a motion to inform the court that she was "unavailable or ill."

From December 27, 2015 to December 30, 2015, Respondent was hospitalized with

21

a flare up.

By January 4, 2016, Respondent still had not communicated with Ms. Spencer. As a result, Ms. Spencer sent the following email:

> I have not heard from you since our conversation in early December during which you advised that you would be in touch with me by mail before the end of the month and that you planned to file additional documents with the court. Please advise on the status of my case. I do not want to report this matter to the AGC and/or institute legal action but I cannot imagine why I have not heard from you. If you are ill, please advise what procedure(s) you have put in place to protect your clients' interest. If you feel there is something that you can do to mitigate the current situation, please advise promptly.

The next day, Respondent emailed her reply:

> I am ill and just go[t] out of the hospital last week. However, because of my continued illness, I am suspending my practice and terminating my service with you. At this time I am in the process of preparing your file to be returned to you.

The hearing judge found Respondent's email to be a knowing and intentional misrepresentation because, as discussed later in this opinion, Respondent was not in fact suspending her law practice. Respondent failed to return Ms. Spencer's client file.[9] The hearing judge also found that Respondent "never advised Ms. Spencer that she was incapacitated or otherwise unable to represent her due to health limitations."

On October 9, 2014, the same day that Ms. Spencer executed the retainer agreement with Respondent, Respondent deposited the $750.00 initial fee into her attorney trust account, and then immediately made a cash withdrawal of $125.00 from the same account.

---

[9] On February 8, 2018, Respondent turned the file over to Bar Counsel. It is unclear whether Bar Counsel then turned the file over to Ms. Spencer.

By October 20, 2014, less than two weeks later, Respondent had withdrawn the remaining $625.00. On November 10, 2014, Ms. Spencer wrote a check to Respondent for the remaining $750.00 owed under the retainer agreement. That same day, Respondent deposited Ms. Spencer's check into her attorney trust account, and then immediately made a cash withdrawal in the amount of $100.00. By November 25, 2014, Respondent had withdrawn all of Ms. Spencer's remaining funds.[10] Respondent never provided Ms. Spencer with any billing statements during her representation, nor did she refund any portion of Ms. Spencer's retainer fee. Although Respondent testified that these funds were earned, the hearing judge found the testimony "lack[ed] any credibility." Additionally, due to Respondent's failure to provide documents to Bar Counsel during discovery, the hearing judge precluded Respondent from introducing evidence of her record keeping.

*Representation of Gloria Marigny*

In September 2012, Gloria Marigny, believing she had been discriminated against, resigned from her position as a Licensed Practical Nurse with the Department of Veterans Affairs Medical Center ("VA") in Memphis, Tennessee. The VA's agency decision denied Ms. Marigny's claims on September 14, 2014. Ms. Marigny filed two *pro se* discrimination actions against the VA. One action was in the United States District Court for the Western District of Tennessee (the "Equal Employment Opportunity Commission action" or "EEOC action"), the other was with the United States Merit Systems Protections Board (the "MSPB action") in Atlanta.

---

[10] The trial judge inadvertently stated that all the funds were withdrawn by November 25, 2015, rather than 2014.

23

In early December 2015, Ms. Marigny's sister referred Ms. Marigny to Respondent. On December 20, 2015, Ms. Marigny executed Respondent's retainer agreement, which provided that Respondent would represent Ms. Marigny in both actions. The agreement required Ms. Marigny to pay a retainer fee of $3,500.00 and an hourly rate of $325.00. Ms. Marigny paid half of the retainer fee when she executed the contract.

Respondent was present for two telephonic conferences (one for the MSPB action and one for the EEOC action). During the EEOC conference, Respondent agreed to enter her appearance within the week and to make her Initial Disclosures by January 6, 2016. During the MSPB conference, Respondent stated that she would streamline a list of witnesses that Ms. Marigny had previously prepared and designate herself as Ms. Marigny's representative.

From December 27 through December 30, 2015, Respondent was hospitalized due to a flare up of her ulcerative colitis. On December 29, 2015, however, Respondent wrote a $2,150 check from her attorney trust account payable to herself. The memo line of the check listed "Atty fees – G. Marigny/A. Fowler."[11] Then, on January 4, 2016, Respondent wrote another check from her attorney trust account payable to herself, this time for $600. The memo line listed "Atty fees – A. Fowler, Marigny." The invoices that Respondent provided to Bar Counsel show that Respondent had performed 2.6 hours of work as of

---

[11] In Respondent's deposition, she said that "A. Fowler" was a former client, but she was unable to say what portion, if any, of the check was attributable to "A. Fowler." Respondent assured Bar Counsel during the deposition that she would review her records and provide an answer by the close of business the following day. Respondent, however, did not provide Bar Counsel a response. Respondent was later precluded from introducing evidence of her record keeping due to her failures during discovery.

January 4, 2016. Thus, Respondent had earned only $845 of the $2,750 she disbursed to herself.

In the MSPB matter, around January 4, 2016, Respondent told Ms. Marigny that she did not need to attend the hearing before the administrative judge.[12] The next day, neither Respondent nor Ms. Marigny appeared for the hearing. Consequently, the administrative judge issued an Order to Show Cause that stated in relevant part:

> On January 5, 2016, at 10:00 a.m. EST, the agency called in for the prehearing conference, but neither the appellant nor [Respondent] did. To date, I have received no written confirmation from the appellant or [Respondent] that [Respondent] is representing the appellant in these proceedings; therefore, unless I am informed otherwise, I will assume that [Respondent] is not representing the appellant.
>
> The appellant is hereby given an opportunity to show cause why she did not participate in the previously schedule[d] January 5, 2015 prehearing conference. If the appellant shows good cause, I will reschedule the prehearing conference. The appellant['s] response to the order must be **received** no later than **January 12, 2016**. Any response to the appellant's submission by the agency must be **received** no later than **January 19, 2016**.

On January 5, 2016, Respondent called the VA representative to discuss the MSPB matter and explained that she did not appear at the hearing because she had mistakenly thought it was set for a different day. The VA representative emailed Respondent to

---

[12] In MSPB matters, the Board may assign the case to an "Administrative Judge." U.S. Merit Systems Protection Board, https://www.mspb.gov/appeals/appeals.htm [https://perma.cc/AT2J-CEJF]. "Judge" in this context is defined as "[a]ny person authorized by the Board to hold a hearing or to decide a case without a hearing, including the Board or any member of the Board, or an administrative law judge appointed under 5 U.S.C. 3105 or other employee of the Board designated by the Board to hear such cases, except that in any case involving a removal from the service, the case shall be heard by the Board, an employee experienced in hearing appeals, or an administrative law judge." 5 C.F.R. § 1201.4(a) (2017).

provide her with a copy of the "Prehearing Submission," which was filed by Ms. Marigny's previous counsel, and to inform Respondent that the administrative judge had just issued an "Order to Show Cause." The VA representative later emailed Respondent a copy of the order. Respondent did not file a response by the January 12, 2016 deadline. Respondent also did not inform Ms. Marigny of her failure to appear at the January 5, 2016 hearing.

On January 12, 2016, Respondent traveled to Memphis to meet with Ms. Marigny. They discussed Ms. Marigny's cases[13] for approximately two hours. Respondent assured Ms. Marigny that Respondent would continue to work on her cases. At the meeting, Ms. Marigny paid Respondent an additional $400 and gave her several compact discs relating to her case. Respondent once again did not inform Ms. Marigny about the Order to Show Cause, nor did she inform Ms. Marigny that she had not entered her appearance in the EEOC matter or that she had not filed the Initial Disclosures by the court's deadline.

Ms. Marigny's $400 check was returned for insufficient funds. Nevertheless, Respondent disbursed $400 from her attorney trust account to herself. At that point, Respondent had exhausted Ms. Marigny's advance fee of $1,750. Respondent never re-deposited the $400 into the attorney trust account.

On January 19, 2016, the VA filed a motion to dismiss the MSPB matter based on Respondent's failure to respond to the Order to Show Cause. The VA representative emailed Respondent and attached the motion to dismiss. The email stated:

I filed the attached. Somehow, the system has your name as [the] one who

---

[13]   The hearing judge found that Respondent spoke with Ms. Marigny about her "case," but Ms. Marigny's testimony, which the hearing judge credited, and the record suggest that both actions were discussed at this meeting.

26

is to be notified by U.S. Mail of pleadings, but it doesn't list your U.S. Mail address, and I don't have it. Maybe the judge added you after your voicemail to her a few weeks ago? I don't know.

Respondent did not respond. Respondent also did not file a response to the motion to dismiss.

Also on January 19, 2016, Respondent told Ms. Marigny that she had been sick, but was now out of the hospital and wanted to "catch up" about the two cases. Respondent was then hospitalized from January 20, 2016 until February 4, 2016.

On January 21, 2016, Ms. Marigny emailed Respondent to ask about the status of her MSPB case. Ms. Marigny explained that she was unable to retrieve information through the MSPB e-file system. Ms. Marigny offered to help Respondent "remedy the situation," if needed. On January 27, 2016, Respondent, while in the hospital, spoke briefly with Ms. Marigny and stated that she would call her later. Respondent never called.

On February 3, 2016, counsel for the VA wrote to Ms. Marigny regarding her EEOC matter, stating:

> A scheduling conference was held in your case on December 22, 2015. At that time, [Respondent] appeared by telephone and indicated she would be representing you. The Court directed [Respondent] to file a notice of appearance by the close of business the following day. To date, [Respondent] has not filed a notice of appearance, provided any contact information, contacted my office, or taken any other steps to indicate her continued involvement in this case. As a result, I am forced to assume that you are proceeding in this matter without representation. If this assumption is incorrect, please have [Respondent] (or other counsel of your choosing) file a notice of appearance as soon as possible.
>
> *          *          *
>
> Please provide me a copy of your Initial Disclosure on or before February 12, 2016. If I have not received your disclosures by that time, I will have to

27

request assistance from the Court in resolving this matter.

In mid-February 2016, Ms. Marigny filed a *pro se* motion for a continuance in the EEOC matter because she had not heard from Respondent. The motion explained that Respondent was recently hospitalized and incommunicado. The Court granted Ms. Marigny's motion and extended the time to file the Initial Disclosure until February 26, 2016.

Two days later, Ms. Marigny wrote to Respondent, whom she had not heard from since January 27, 2016, stating:

> Please contact me soon regarding MSPB case and [t]he Federal case. [The VA attorney in the EEOC case] has contact[ed] me also regarding my Federal [case], I have Initial Disclosure due soon. I hope that you were able to listen to the copies of the CD[s] that were given to you as some of my exhibits for my case with MSPB and Federal.
>
> *            *            *
>
> No one from your office has contacted me regarding your status. As my representative it is improper. I have not received court permission to withdraw from representation. I'm requesting you to surrender papers and files given to you. Please[] refund my advance payment of fee that has not been earned or incurred, and [the] 5 CD's given to you on 1/12/2016 during our face to face meeting/discussion of your conversation regarding interaction with Ms. Keta Barnes (Dept. of Veterans Affair Attorney).

Ms. Marigny then wrote a letter to the administrative judge in the MSPB matter to explain why her claim should not be dismissed.

On February 18, 2016, Respondent called Ms. Marigny. Respondent told Ms. Marigny that she was out of the hospital and would resume working on Ms. Marigny's case no later than February 25, 2016. In response, Ms. Marigny wrote to Respondent:

> Please be advised this is the second letter requesting you to surrender papers

and files given to you. Please refund my advance payment of fee $1,750.00 that has not been earned or incurred and 5 Cd's given to you on 1/12/2016 during our face to face meeting[.]

Respondent did not respond.

On March 2, 2016, the Board issued an order that rescheduled the MSPB matter for April 28, 2016, and set a prehearing conference for April 13, 2016. Respondent was given notice of the order.

Two weeks later, the VA's representative emailed Respondent to ask if she was still representing Ms. Marigny. The VA's representative also offered to help streamline the witness list because the deadline was approaching.

The following day, the VA's representative, having not heard from Respondent, sent Ms. Marigny a similar email and copied Respondent. Later that same day, Respondent emailed the administrative judge a motion to withdraw from her representation of Ms. Marigny due to an inability to maintain an appropriate working relationship. Respondent sent Ms. Marigny the motion eleven days later. The hearing judge found that Respondent "abandoned Ms. Marigny in the MSPB matter."

As for the EEOC matter, on March 11, 2016, the court granted a motion to compel based on Ms. Marigny's (and Respondent's) failure to file the Initial Disclosures. The court then set March 21, 2016, as the new deadline for Ms. Marigny to comply.

On April 1, 2016, the VA's counsel moved for sanctions against Ms. Marigny. The motion claimed that Ms. Marigny had misrepresented that she obtained counsel to represent

her in this case. The court denied the motion, however, and set May 20, 2016,[14] as the new deadline for Ms. Marigny to submit the Initial Disclosures. When the Initial Disclosures were not sent by the new deadline, the VA's counsel again moved for sanctions. Ms. Marigny wrote to the court and explained that Respondent had failed to return her "paper and property," which made it difficult for her to obtain new counsel.

The hearing judge found that Respondent "failed to take any other action in the EEOC and MSPB matters," which resulted in Ms. Marigny proceeding *pro se*. The hearing judge also found that Respondent "failed to explain the 'pros and cons' of Ms. Marigny's case at any stage of the representation prior to abandoning it."

On July 13, 2016, the court dismissed Ms. Marigny's EEOC action. The MSPB matter was pending when the hearing judge issued his findings.

Respondent did not return Ms. Marigny's client file in a timely manner, nor did she return Ms. Marigny's retainer fee. In fact, throughout her representation of Ms. Marigny, Respondent failed to maintain a proper accounting of Ms. Marigny's funds and never sent her an invoice. The invoice Respondent ultimately provided to Bar Counsel did not include: (1) "any information relating to the dates on which the Respondent deposited and disbursed Ms. Marigny's funds"; (2) "the amount of each transaction"; and (3) "the payee and [the] check number associated with each transaction." The hearing judge therefore rejected Respondent's testimony that she performed additional work not listed on her invoice for Ms. Marigny.

---

[14] The hearing judge inadvertently found May 20, *2018*, as the date for the new deadline. (Emphasis added).

30

During Bar Counsel's initial investigation of Respondent, Respondent continued her representation of Ms. Spencer and Ms. Marigny. Her misconduct during those representations generated additional complaints and required additional investigations. As a result of this overlap between misconduct and investigations, our summary of the investigation is somewhat tangled.

On September 11, 2014, in response to Ms. Keller's complaint, Bar Counsel wrote to Respondent and provided her a copy of the complaint and requested a written response within fifteen days. Respondent did not respond.

On October 6, 2014, Bar Counsel wrote to Respondent again, but this time requested a response within ten days. Two days later, Respondent replied by stating that she had "every intent[ion] to pay for [Ms. Keller's] services" and that she had "spoken with Ms. Keller or someone from her office and informed them that [she] was out of the office sick." Respondent also stated that she was "back in the office fulltime" and "back in a position to work with Ms. Keller to get the invoices paid."

On November 18, 2014, Respondent informed Bar Counsel that she would "pay Ms. Keller in full by December 15, 2014." Respondent did not pay Ms. Keller by that date.

On December 12, 2014, Ms. Houston filed her complaint with Bar Counsel. On January 13, 2015, Bar Counsel provided Respondent with a copy of the complaint and requested a response with fifteen days. That same day, Bar Counsel wrote a separate letter to Respondent requesting confirmation by January 28, 2015, that she had paid Ms. Keller. Respondent did not respond.

On February 13, 2015, Bar Counsel repeated her requests from January 13, 2015, regarding Ms. Keller's complaint and Ms. Houston's complaint. Respondent did not respond.

From March 18 to March 31, 2015, Bar Counsel's investigator, Michael Peregoy, made several attempts to contact Respondent. On March 31, 2015, Respondent left a voicemail for Mr. Peregoy stating that she was in the hospital and would contact him once she was discharged. Respondent's medical records reveal that she was discharged from the hospital that same day.

Over a week later, Respondent called Mr. Peregoy and asked for copies of the outstanding requests relating to the Keller and Houston matters. Respondent assured Mr. Peregoy that she would respond within two weeks of receiving the materials.

On April 9, 2015, Bar Counsel sent copies of all prior correspondence to Respondent's home address. On April 14, 2015, Respondent called Mr. Peregoy to confirm receipt of the materials and to verify her Colesville Road Office address. Respondent also told Mr. Peregoy that she would provide her written responses by April 20, 2015.

On May 12, 2015, Respondent submitted her responses for the Houston matter (but not the Keller matter) and explained that the responses were late because she had been in the hospital. There was no finding that Respondent had been recently hospitalized.

On June 22, 2015, Bar Counsel again requested Respondent's response to Ms. Keller's complaint. Bar Counsel also sought documentation associated with Respondent's medical issues and hospitalizations that, according to Respondent, occurred during her representation of Ms. Houston. Bar Counsel gave Respondent seven days to respond.

On June 29, 2015, Respondent wrote to Bar Counsel. In the letter, Respondent expressed that she had spoken with Ms. Keller, "made payment arrangements to immediately pay one of the three invoices," would "pay the second invoice in two weeks[,] and pay the final invoice two weeks after that date." Respondent enclosed a "copy of a postal money order in the amount of $340.25 and a hospital discharge notice dated March 31, 2015." Respondent did not provide any documentation regarding her medical issues that allegedly took place during the Houston matter.

On July 2, 2015, Bar Counsel once again requested an explanation for Respondent's failure to refund Ms. Houston's funds given her email stating that a refund was forthcoming. Respondent did not respond.

On July 27, 2015, Ms. Richardson filed a complaint with Bar Counsel. On August 5, 2015, Bar Counsel mailed Respondent a copy of the complaint and requested a written response within fifteen days. Respondent did not respond.

On August 27, 2015, Bar Counsel wrote Respondent again, sending a copy of the August 5, 2015 letter and requesting a response within ten days. Respondent responded belatedly and partially on September 13, 2015. Respondent's response asked for additional time based on her hospitalization from August 27 to August 30, 2015. Bar Counsel granted Respondent's extension and set the deadline for September 30, 2015. Respondent did not respond by September 30, 2015, nor does the record reflect that Respondent ever responded to Bar Counsel's request.

Meanwhile, on August 14, 2015, Ms. Dyer filed her complaint with Bar Counsel. On September 18, 2015, Bar Counsel sent Ms. Dyer's complaint to Respondent and

requested a response within fifteen days. Respondent did not respond.

Given Respondent had not provided responses to the Richardson or Dyer matters, Bar Counsel, on October 7, 2015, again wrote to Respondent asking for her responses no later than October 17, 2015. Respondent did not respond.

On December 14, 2015, Bar Counsel wrote to Respondent once more regarding the Richardson and Dyer matters. Bar Counsel included copies of the previous correspondence, advised Respondent that the Dyer complaint was now docketed for further investigation, requested a detailed explanation of Respondent's failures to respond, and sought a copy of Ms. Richardson's client file. Respondent did not respond.

On February 29, 2016, Ms. Marigny filed a complaint with Bar Counsel. On March 16, 2016, Bar Counsel mailed the complaint to Respondent and requested a response within fifteen days. Respondent did not respond.

On April 29, 2016, Bar Counsel sent a second letter and a second request regarding the Marigny matter. Respondent did not respond.

On May 23, 2016, Ms. Spencer filed her complaint with Bar Counsel. On June 7, 2016, Bar Counsel sent Respondent copies of the prior correspondence in the Spencer and the Marigny matters, advised Respondent that the matters were docketed for further investigation, and requested a response within ten days. Respondent did not respond.

On June 23, 2016, Bar Counsel made another request for a response in the Spencer and Marigny matters. Respondent did not respond.

On August 3, 2016, Bar Counsel sent letters to Respondent's home and offices. Bar Counsel included copies of the previous correspondence regarding the Spencer and

Marigny matters and requested a response within seven days. Twenty-two days later Respondent faxed and emailed Bar Counsel to request an extension of time to respond to those matters. Bar Counsel granted the extension through September 9, 2016.

On September 8, 2016, Respondent sent a response to Bar Counsel regarding the Spencer and Marigny complaints. In her response, Respondent stated that she had "located all of Ms. Spencer's records" and returned them to Ms. Spencer. Respondent did not return Ms. Spencer's client file, nor did she provide a copy of the file to Bar Counsel until February 8, 2018.

## II.

## The Hearing Judge's Conclusions of Law

The hearing judge determined that Respondent violated MLRPC 1.1, 1.2, 1.3, 1.4(a) and (b), 1.5(a), 1.15(a) and (c), 1.16(a) and (d), 3.4(c) and (d), 8.1(b), and 8.4(a), (c), and (d). Respondent excepts to each of the hearing judge's conclusions of law; Bar Counsel excepts to none. We shall address each conclusion and, in the course of doing so, address the pertinent exceptions.

## III.

## Standard of Review

This Court has "original and complete jurisdiction" in attorney disciplinary proceedings and "conducts an independent review of the record." *Attorney Grievance Comm'n v. McLaughlin*, 456 Md. 172, 190 (2017) (citation omitted). The hearing judge's findings of fact are left undisturbed unless those findings are clearly erroneous or either party excepts to them. *Attorney Grievance Comm'n v. Kremer*, 432 Md. 325, 334 (2013).

35

The hearing judge's factual findings are not clearly erroneous if they are supported by "any competent material evidence[.]" *Attorney Grievance Comm'n v. McDonald*, 437 Md. 1, 16 (2014) (citation omitted). We review the hearing judge's conclusions of law without deference. *Attorney Grievance Comm'n v. Hamilton*, 444 Md. 163, 178 (2015).

## IV.

## Discussion

### Respondent's Factual Exceptions

*Exceptions Regarding the Factual Background*

Many of Respondent's exceptions are flawed for two reasons: (1) they lack any evidentiary support in the record or (2) the only support Respondent has for her exception is her own testimony, which the hearing judge determined—and we accept—was not credible save for that which was corroborated by medical records. Because Respondent fails to present (or cannot present) any other evidence that would warrant overturning the hearing judge's findings of fact or conclusions of law, we overrule these exceptions. *See, e.g.*, *Attorney Grievance Comm'n v. Thompson*, 462 Md. 112, 134 (2018) ("Given that Respondent did not present further evidence in the record to reveal that the hearing judge's findings were clearly erroneous, we reject Respondent's factual exceptions."). To illustrate our point, we present the following examples.

Respondent excepts to the hearing judge's absence of findings that her Colesville Road Office and Apollo Drive Office were "virtual office spaces" and that Respondent participated in a medical research study in 2014. The record is devoid of any documentation apart from Respondent's testimony that would corroborate Respondent's

36

argument that her offices were "virtual." As to the research study, the record reflects that Respondent "was seen in [Capital Digestive Care's] office" approximately once a month from July 2013 until November 2014, but it does not reflect the nature of those visits other than that they were "Follow Up[s]." We therefore overrule both exceptions as both are grounded solely in Respondent's testimony, which as noted, the hearing judge found to lack any credibility.

For the same reasons, we overrule Respondent's overarching exception, which is that her illness serves as an "explanation" for her misconduct. Respondent has maintained that her illness, along with other factors, should serve as a basis to dismiss both petitions for disciplinary or remedial action. The hearing judge rejected this assertion and found that Respondent's reliance on her illness as a defense was "insincere," "deceitful," and "deceptive." Thus, although the hearing judge recognized that Respondent's illness was a burden, he rejected her argument that her illness excused her years of misconduct. We accept the finding that Respondent was insincere about her illness.

The hearing judge also made a number of findings that Respondent made misrepresentations regarding her repeated assurances to all but one of her clients that she would work on their cases. Respondent excepts to those findings, arguing that she had every intention of working, but that her illness prevented her from doing so. The hearing judge found, and we accept as not clearly erroneous, that Respondent's use of her illness as a defense was "deceptive."

The record is riddled with instances in which Respondent told clients, opposing attorneys, Bar Counsel, and the courts that she was hospitalized or sick at times that

Respondent is unable to corroborate with medical records. The most egregious example, perhaps, occurred on Friday, April 3, 2015, when Respondent moved for a continuance without authorization from her client and represented to the court that she was "currently hospitalized." In fact, Respondent was discharged from the hospital three days earlier on Tuesday, March 31, 2015. Respondent also, after failing to reply to Bar Counsel's earlier requests for responses, told Bar Counsel's investigator that she would call him once she was discharged from the hospital. In reality, she was discharged from the hospital the same day she spoke with him and did not call him back until over a week later. Respondent misrepresented the severity of her illness when she told Bar Counsel in mid-May that her responses (which had been requested multiple times) were delayed because she was in the hospital. Between April 9, 2015 and May 12, 2015, Respondent was not in the hospital.[15]

Respondent argues, by way of "explanation," that she had every intention to continue working, and thus made no misrepresentations to her clients when she assured them that she would do so. This argument is without merit. Respondent provided no evidentiary support, other than her own testimony, which the hearing judge discredited. We therefore treat Respondent's "explanation" as an exception to the hearing judge's finding and overrule the exception.

*Exceptions Regarding the Representation of Rochell Richardson*

Respondent excepts to the hearing judge's finding that "[o]n or about May 29, 2012, Ms. Richardson advised the Respondent that Capitol Improvement Contractor had filed its

---

[15] During this time frame, Respondent's medical records reflect two office visits on April 9, 2015, and May 7, 2015, but no other treatment.

38

lawsuit." The hearing judge further found that "[t]he Respondent told Ms. Richardson that arbitration was unnecessary and that she would file a lawsuit on behalf of Ms. Richardson directly in court." Respondent maintains that she learned of the matter in June, as opposed to May, and that she denies advising Ms. Richardson that arbitration was unnecessary or that Respondent would file suit on Ms. Richardson's behalf. Ms. Richardson testified at the hearing below that Respondent had said she "was going to go straight to court, she didn't want to go through with arbitration no more because that was done and past and that she was going to go straight to the court and handle it." Based on Ms. Richardson's testimony, which the hearing judge credited, we overrule Respondent's exception.

Respondent next takes exception to the hearing judge's findings that she misled Ms. Richardson and Ms. Boddie, by stating that she would continue to work on Ms. Richardson's case; she took no action to protect the interests of Ms. Richardson when she was sick; and aside from writing three letters, she took no other steps to pursue any claims against the contractor Capitol. Respondent argues that she intended to keep working, but that her illness prevented her from doing so and her retainer agreement limited her representation solely to the arbitration matter. Neither justification is availing.

Once again, we overrule Respondent's exception to the hearing judge's finding that Respondent's use of her illness as a defense was deceptive. Respondent began her representation of Ms. Richardson in October 2011 and the representation appears to have continued until Ms. Richardson filed her complaint with the Attorney Grievance Commission in July 2015. Although Respondent went to Capital Digestive Care on a monthly basis from July 2013 until November 2014, nothing in the record suggests that

39

Respondent's illness was so debilitating during that time that it prevented her from fulfilling her duties to Ms. Richardson or at the very least communicating with Ms. Richardson. Even if her illness was debilitating, Respondent nonetheless had an obligation to inform Ms. Richardson, find successor counsel, and withdraw from her representation. *See* MLRPC 1.16(a)(2); *Attorney Grievance Comm'n v. Lee*, 393 Md. 546, 567 (2006) ("[I]f ill health indeed renders an attorney physically unable to perform his or her duties to the court and clients, he or she must promptly inform the court, clients, and other participating attorneys that his or her caseload cannot be managed and, without unreasonable delay, make necessary arrangements to protect clients' interests, such as transferring cases to other attorneys."). It is undisputed that all of Respondent's hospitalizations occurred either near the end of her representation of Ms. Richardson or after the representation had ended. It follows that Respondent's earlier failures to represent Ms. Richardson in a competent and diligent manner over the roughly four-year representation cannot be excused by the later hospitalizations.

The hearing judge further found that Respondent took no action to protect Ms. Richardson's interests. Respondent excepts to this finding and argues that she was not Ms. Richardson's attorney "for all times and all purposes." She further claims that she "took all reasonable steps to resolve the arbitration matter," which, she insists, was a condition precedent to taking any action in filing a civil suit.

The hearing judge rejected that arbitration was a "condition precedent" to filing an action against Capitol, which had filed its own civil action against Ms. Richardson. Moreover, the hearing judge's finding is amply supported by Respondent's inaction in the

matter for which she was hired, i.e., the arbitration and civil suit. In addition to Respondent's inaction in the lawsuit Capitol filed against Ms. Richardson, Respondent also failed to send a demand letter to Capitol or follow up on the demand letters that Respondent did send. We therefore overrule Respondent's exception.

Based on Respondent's lack of follow through, her repeated assurances that she would take action, and her continued inaction, the hearing judge's finding is not clearly erroneous.

*Exceptions Regarding the Representation of Brenda Dyer*

Respondent was hired to represent Ms. Dyer in a lawsuit against Walmart for injuries sustained during a Black Friday event. The hearing judge found that Respondent allowed the statute of limitations to run and had made misrepresentations in the process. Respondent excepts to the hearing judge's finding that she made a knowing and intentional misrepresentation when Ms. Dyer asked, "Is the lawyer in Arkansas going to file?" and Respondent replied, "Yes." Respondent claims that she intended to have someone file suit but was unable to do so because she was fired beforehand. Respondent further argues that because Ms. Dyer's question to her was about future performance, Respondent's intent to file suit at that time was not a misrepresentation.

Respondent relies on her testimony concerning her collection of Ms. Dyer's medical records as demonstrative of her intent. The collection of Ms. Dyer's medical records, some of which Ms. Dyer appears to have sent Respondent, does not establish that the hearing judge's finding was clearly erroneous. The record is devoid of testimony or documentary evidence, other than Respondent's discredited testimony, that might validate Respondent's

41

argument that she had the intent to file suit in Arkansas on behalf of Ms. Dyer. Hence, we overrule this exception.

*Exceptions Regarding the Payments to Marguerite Keller*

Respondent takes exception to the hearing judge's finding that she made misrepresentations to Ms. Keller regarding the payment of three invoices. Respondent again relies on the argument that she had the intent to pay Ms. Keller, and thus, her statements that she was going to pay were not misrepresentations. Respondent's exception relies on an inaccurate reading of the hearing judge's findings. The hearing judge found that Respondent made misrepresentations to Bar Counsel, not Ms. Keller. Presumably, this is the misrepresentation on which Respondent takes exception.

Once again, Respondent's only evidence of her intent is her own testimony. The hearing judge found that testimony lacked credibility; and hence, we overrule Respondent's exception.

*Exceptions Regarding the Representation of LaTasha Houston*

The hearing judge found that in Respondent's first attempt to obtain Mr. Wilson's financial information with a subpoena, she provided a return date after the date on which the subpoena was served. Respondent excepts to this finding arguing that the "actually served" subpoena had a different return date and that the subpoena was rejected based on violations of *Touhy* regulations.[16]

---

[16] *Touhy* regulations refer to "[h]ousekeeping regulations that create agency procedures for responding to subpoenas[.]" *COMSAT Corp. v. Nat'l Sci. Found.*, 190 F.3d 269, 272 n.3 (4th Cir. 1999) (citing *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951)).

We overrule Respondent's exception. The record is unclear what subpoena was served and when.[17] Yet, the Marshals Service's court filing supports the hearing judge's finding that it was served with a subpoena after the subpoena's listed return date. Moreover, Respondent has failed to provide any support that the subpoena was rejected due to violations of *Touhy* regulations. Consequently, Respondent once again has failed to establish that the hearing judge's findings are clearly erroneous, and therefore we overrule her exception.

Respondent next excepts to the hearing judge's finding that she performed no meaningful legal services in Ms. Houston's case. Respondent states that she "extensively communicated with Ms. Houston via email, researched the legal status of the case, attempted to gather information to demonstrate a significant change in circumstances by issuing a subpoena for Mr. Wilson's payroll records, prepared interrogatories[,] and attended two court hearings with Ms. Houston." Respondent also argues that a motion to modify a child support order ordinarily cannot be filed within three years.

Critical to the hearing judge's finding is that Respondent performed "no *meaningful*

---

[17] We found two subpoenas in the record: the return date on the first is "May 1, 2014," and the return date on the other references "May 4, 2014," which is then scratched out and replaced with what appears to be "June 4, 2014." Respondent claims that it reads "June 1, 2014." If Respondent is correct, this later-dated subpoena, which was served on Friday, May 30, 2014, would have required the Marshals Service to respond two days later, i.e., on Sunday. Assuming for the sake of argument that the date is June 4, 2014, the Marshals Service still would have had only three business days to reply. In the Superior Court of the District of Columbia, where the subpoena was filed, "the court must quash or modify a subpoena that . . . fails to allow reasonable time to comply." D.C. Super. Ct. R. Civ. P. 45(c)(3)(A)(i) (2017). While it remains unclear what exactly compelled the court to quash Respondent's subpoena, there is no evidence that the hearing judge's finding is clearly erroneous.

legal services." (Emphasis added). In Ms. Houston's case, Respondent was hired to file a motion to modify a child support order and a motion to recuse the judge. Respondent filed neither and was unable to provide drafts of the motions when the representation ended. Much of what Respondent points to as proof of doing meaningful work is supported only by her own testimony, which again, the hearing judge determined was not credible. The hearing judge found, among other things, that the subpoena Respondent prepared failed to obtain the desired financial information and that Respondent never moved to compel responses to her interrogatories once the discovery deadline passed. In short, the hearing judge's finding that neither was "meaningful" is not clearly erroneous.

Respondent argues, too, that in the District of Columbia, a motion to modify child support cannot ordinarily be filed within three years. This argument is undermined by Mr. Wilson's motion to modify, which was filed at the same time Ms. Houston asked that her motion be filed. Moreover, if Respondent felt she could not file a motion for three years without Mr. Wilson's financial information, she should have informed Ms. Houston of that limitation, which the hearing judge found she did not. Thus, we overrule Respondent's exception.

Respondent excepts to the hearing judge's finding that she disbursed money before it was earned. Not only does Respondent claim that all of her fees were earned, she further argues that Ms. Houston "has a balance due" to Respondent.

The hearing judge found that even if he credited the work that Respondent listed in her "false invoice," her bank records reveal that she deposited funds prior to earning them. Respondent deposited Ms. Houston's $1,000.00 retainer fee into her attorney trust account

44

on March 31, 2014, and withdrew $1,000.00 by April 14, 2014. As of May 1, 2014, Respondent did 3.5 hours of work. Billing at $275.00 an hour, Respondent was entitled to only $962.50 of $1,000.00.[18] Respondent also admitted that she did not "maintain any client recordkeeping with respect to Ms. Houston," but then testified that her invoice did not reflect all the work that she did. The hearing judge found Respondent's testimony was not credible and Respondent has no other evidence to support her argument. Thus, Respondent's exception lacks support, and we overrule it.

*Exceptions Regarding the Representation of Angela Spencer*

The hearing judge found that Respondent "failed to respond" to Ms. Spencer on January 16, 2015. Despite Respondent's claim that she responded, she does not cite, nor were we able to find, anything in the record that supports her assertion. Thus, we accept the hearing judge's finding as not clearly erroneous.

Respondent next excepts to the hearing judge's finding that "[d]uring the hearing [at which Respondent failed to appear], the [District] Court called the Respondent and advised that they reset [the] hearing for November 3, 2015." Respondent, in her exceptions to this Court, "represents that this never happened and is not the standard practice for [the] District Court in Prince George's County, Maryland." The hearing judge was free to discount Respondent's testimony and rely on the testimony of opposing counsel in that case, which was that, in fact, the judge had called Respondent and established a new date

---

[18] In our review of the record, as of April 14, 2014, Respondent's "false invoice" listed only 1.9 hours of work. It appears, then, that when she deposited $1,000.00, she was only entitled to $522.50.

for the hearing after Respondent failed to appear. *See Attorney Grievance Comm'n v. Hodes*, 441 Md. 136, 181 (2014). Therefore, we overrule Respondent's exception to the hearing judge's finding.

Respondent also excepts to the hearing judge's finding that she had misrepresented to Ms. Spencer that she was "suspending her law practice." The hearing judge found that Respondent's email to Ms. Spencer read, in pertinent part, "I am suspending my practice and terminating my service with you." Respondent argues to this Court that she meant that she was merely suspending her practice as to Ms. Spencer. Respondent's argument is sophomoric and her interpretation of her email conflicts with what a reasonable person would infer from the statement. Hence, the hearing judge's finding that this was a knowing and intentional misrepresentation is not clearly erroneous.

The hearing judge found further that Respondent did not earn her fees. Respondent excepts to that finding, arguing once again that she maintained the records for some, but not all, of the work she performed. The hearing judge rejected this explanation because it was based entirely on her incredible testimony. The hearing judge, moreover, precluded Respondent from presenting any evidence of such recordkeeping due to her failure to respond to Bar Counsel during discovery. Consequently, we overrule her exception.[19]

---

[19] Respondent also excepted to several other findings (that she continuously refused to send Ms. Spencer her client file; that she performed no meaningful legal services; that she made misrepresentations to Ms. Spencer; and that she did not earn her legal fees) arguing that her illness was the cause. The hearing judge rejected Respondent's illness as a defense. Respondent is unable to establish that the hearing judge's finding was clearly erroneous, and therefore we overrule her exceptions.

46

*Exceptions Regarding the Representation of Gloria Marigny*

Respondent excepts to the hearing judge's finding that she did "little to no work" in Ms. Marigny's case and that she did not earn her legal fees. Respondent once again argues that her records do not reflect all of the work she performed. The hearing judge did not credit Respondent's claim that she did additional work not reflected on her invoices. The hearing judge further found that the invoice Respondent prepared did "not include any information relating to the dates on which the Respondent deposited and disbursed Ms. Marigny's funds, the amount of each transaction, and the payee and the check number associated with each transaction." As a result, we overrule Respondent's exception.

Respondent also excepts to the hearing judge's finding that she did not explain to Ms. Marigny the "pros and cons" of her case. Respondent asserts that she decided she would not represent Ms. Marigny in her EEOC case because her claim was unmeritorious, and that she informed Ms. Marigny of this fact during an in-person meeting on January 12, 2016. Ms. Marigny testified that at the meeting Respondent told her that her cases were valid and that she was going to keep working on them. The hearing judge credited Ms. Marigny's testimony over Respondent's, and thus we overrule her exception.

*Exceptions Regarding Bar Counsel's Investigation*

Respondent excepts to the finding that she did not cooperate with Bar Counsel. Respondent blames her lack of communication on her illness, a delay in forwarding mail from her office to her home, and her preoccupation with the death of her mother in June 2016. Respondent further maintains that her mother's death caused her "not [to] return to the area until the end of August of 2016," and that at that point, "she immediately began to

cooperate up to and during trial procedures."

It is not clear if Respondent left the area in June 2016 upon the death of her mother or sometime earlier when her mother was ill, but in any event, Bar Counsel's investigations into Respondent's misconduct began in September 2014. It was then that Respondent became aware that an investigation was ongoing, and it was at that time that she began demonstrating a pattern of unresponsiveness. Moreover, although Respondent made much of her illness, the hearing judge found that she was not so perennially debilitated as to render her unable to respond to her clients or Bar Counsel, who she knew was investigating her.[20] The hearing judge also found that in January 2015, while failing to reply to Bar Counsel's requests, Respondent was able to file a notice of intention to defend in the District Court of Maryland against Ms. Houston. Lastly, on January 4, 2015, the hearing judge found that Respondent told Ms. Spencer that she was "back in town." The hearing judge was, therefore, not clearly erroneous in finding that Respondent was in the area, at least as early as January 2015 and capable of responding to Bar Counsel, but did not. Therefore, we yet again overrule Respondent's exception relating to her illness and also reject her excuse that she was out of the area.

We previously overruled Respondent's exception that she had a virtual office, and even if she did, she failed to arrange to have her mail forwarded to her home.

Finally, Respondent's mother's death was undoubtedly tragic, but Respondent remained under an obligation to communicate to Bar Counsel if her duties as a daughter

---

[20] In fact, the record reflects that even when Respondent was hospitalized, she had access to and used her phone and email.

were going to interfere with her legal duties.  *See Attorney Grievance Comm'n v. Bleecker*, 414 Md. 147, 174 (2010) (collecting cases).  She took no steps to notify Bar Counsel, and thus we overrule her exception that her mother's death justifies her failure to respond to Bar Counsel.

**Conclusions of Law**

We turn now to our review of the hearing judge's conclusions of law and address Respondent's exceptions to them.

**MLRPC 1.1: Competence**

MLRPC 1.1 requires an attorney to "provide competent representation to a client." This Court has made clear that "a complete lack of representation is incompetent representation." *Attorney Grievance Comm'n v. Moore*, 451 Md. 55, 79 (2017) (citation omitted).  "Generally, this Court will find a violation of MLRPC 1.1 if an attorney fails to act or acts in an untimely manner, resulting in harm to his or her client."  *Attorney Grievance Comm'n v. Brown*, 426 Md. 298, 319 (2012).  This Court has concluded that an attorney violates Rule 1.1 when he or she "fail[s] to notify [the client] of his court dates, fail[s] to appear on his behalf, and fail[s] to adequately pursue the appropriate relief on his behalf." *Attorney Grievance Comm'n v. Aita*, 458 Md. 101, 132 (2018).  It is a "particularly egregious" violation of Rule 1.1 for an attorney to fail to appear without sufficient explanation. *Attorney Grievance Comm'n v. Hamilton*, 444 Md. 163, 180 (2015); *see also Attorney Grievance Comm'n v. Lang*, 461 Md. 1, 44 (2018).

The hearing judge concluded that Respondent violated MLRPC 1.1 in her representation of Ms. Richardson, Ms. Dyer, Ms. Spencer, and Ms. Marigny.  Respondent

excepts to each of these conclusions.

In the Richardson matter, Respondent violated MLRPC 1.1 by failing to take reasonable steps to participate in arbitration and failing to pursue a lawsuit against Capitol, as Respondent had agreed to do in her retainer agreement. Moreover, Respondent failed to accept service on behalf of Ms. Richardson in Capitol's lawsuit against Ms. Richardson, enter her appearance, file a counter-claim, send a demand letter to Capitol, or follow through on the demand letters she sent to the Better Business Bureau and the Office of Rehabilitation. Respondent's inaction over the span of the representation amounted to a complete lack of representation, and thus was incompetent. *See Moore*, 451 Md. at 79.

In the Dyer matter, by failing "to file, or retain local counsel to file, a lawsuit against Walmart prior to the expiration of the statute of limitations in Tennessee," the hearing judge concluded that Respondent violated MLRPC 1.1. Respondent argues that she was discharged before the statute of limitations ran in Arkansas. This argument is unavailing. Likewise unavailing is Respondent's claim that she intended to file suit; the hearing judge found no such intent. We accepted that finding as not clearly erroneous earlier in this opinion. We therefore conclude, as did the hearing judge, that Respondent's failure "to take the necessary steps to further her client's case" is a violation of Rule 1.1. *Attorney Grievance Comm'n v. Kirwan*, 450 Md. 447, 459 (2016).

In the Spencer matter, Respondent failed to respond to discovery requests, to propound discovery, and to appear at a hearing. As a result, opposing counsel moved for sanctions and dismissal. The court in that case granted both motions. Respondent never informed Ms. Spencer about her failures or the sanctions. Although Respondent eventually

50

told Ms. Spencer about the dismissal, she assured Ms. Spencer that the dismissal would be vacated because Respondent was sick at the time. Despite her assurances, Respondent never filed a motion to vacate or took any other action on Ms. Spencer's behalf. Respondent excepts to the hearing judge's conclusion that these actions and inactions violate Rule 1.1. Respondent's arguments to the contrary are not supported by the record, and therefore we overrule her exception.

In the Marigny matter, Respondent failed to take steps to further Ms. Marigny's objectives in both the EEOC and MSPB matters. Despite assurances to the Board in the MSPB matter that she would file a designation of representative and to the court in the EEOC matter that she would enter her appearance, Respondent did neither. She also failed to appear at a hearing, failed to respond to the resulting Order to Show Cause, failed to respond to a motion to dismiss, failed to file Initial Disclosures, failed to streamline Ms. Marigny's witness list, and failed to take any action whatsoever in the EEOC matter.

Respondent excepts to the hearing judge's conclusion that those failures were in violation of MLRPC 1.1. Respondent attempts to insert facts that were not found by the hearing judge—that the EEOC claim was meritless (which we have already rejected) and that Ms. Marigny failed to designate Respondent as her representative in the MSPB matter.

Even assuming Ms. Marigny was responsible for the failure to file a designation, Respondent's other failures are sufficient to satisfy us that she violated Rule 1.1 in the Marigny matter.

For the reasons listed above, we conclude that Respondent violated Rule 1.1 in regard to the Richardson matter, Dyer matter, Spencer matter, and Marigny matter.

**MLRPC 1.2(a): Scope of Representation**

MLRPC 1.2(a) requires a lawyer to "abide by a client's decisions concerning the objectives of the representation," *Attorney Grievance Comm'n v. Bellamy*, 453 Md. 377, 394 (2017), and to "inform a client of the status of his or her case" so the client has the "ability to make informed decisions," *Hamilton*, 444 Md. at 182. "An attorney's failure to prosecute her client's case, combined with a failure to communicate with the client about the status of the case, may constitute a violation of this rule." *Bellamy*, 453 Md. at 394 (citing *Attorney Grievance Comm'n v. Reinhardt*, 391 Md. 209, 220 (2006)). In *Attorney Grievance Commission v. Brown*, an attorney's inaction led to two of his clients' cases being dismissed. 426 Md. 298, 320 (2012). The attorney then failed to inform the clients of the dismissals and ignored his clients' requests for information. *Id.* We concluded that he violated Rule 1.2. *Id.*

The hearing judge concluded that Respondent violated MLRPC 1.2 during her representation of Ms. Richardson, Ms. Dyer, Ms. Houston, and Ms. Spencer through her failures to abide by the objectives enumerated in each retainer agreement and to keep her clients informed about the status of their respective cases. Respondent excepts to each conclusion of law, arguing that "[m]erely because the cases did not proceed perfectly according to the way that the clients wanted – or failed to achieve the desired result – does not mean that [Respondent] did not purs[u]e the objectives of the clients." Respondent ignores that her inaction all but guaranteed that her clients' objectives would not be met. Hence, we overrule her exception and agree with the hearing judge's conclusions of law that Respondent committed multiple violations of Rule 1.2.

In the Richardson matter, the hearing judge rejected, as do we, Respondent's claim that she could not pursue legal action on Ms. Richardson's behalf until after arbitration took place. Moreover, we rejected earlier in this opinion Respondent's argument that the limited steps she did take were reasonable. Thus, her inaction coupled with her failure to keep Ms. Richardson apprised of the status of her case constitute violations of Rule 1.2.

In the Dyer matter, Respondent failed to file a lawsuit against Walmart and failed to request surveillance footage as requested by Ms. Dyer.[21] Our review of the record discloses that Respondent also failed to notify Ms. Dyer that the Tennessee limitations period had run, and that it was Ms. Dyer who, after doing her own research, raised the issue with Respondent. Respondent also failed to keep Ms. Dyer informed of the status of her case by falsely stating to Ms. Dyer that she had been in contact with Walmart and misrepresented that a lawyer would file suit in Arkansas. These are all clear violations of Rule 1.2(a).

In the Houston matter, despite the objectives of filing a motion for recusal and a motion to modify the child support order, Respondent failed to take any action. This is another clear violation of Rule 1.2.

In the Spencer matter, the hearing judge concluded, and we agree, that Respondent violated Rule 1.2 by failing to pursue Ms. Spencer's counterclaim, as Respondent had agreed to do in her retainer agreement, and also because Respondent "failed to notify Ms.

---

[21] The hearing judge found that Respondent also failed to request a "report" from Walmart. It is unclear what "report" the hearing judge is referring to, but Respondent's remaining failures are sufficient to conclude she violated Rule 1.2.

Spencer of Motions for Continuance, the Order for Sanctions, new trial dates, and ultimately the case's dismissal."

In the Marigny matter, the hearing judge concluded that Respondent "failed to abide by Ms. Marigny's most basic objective of having an attorney represent her in each of her pending matters." We agree. Despite repeated assurances to Ms. Marigny, as well as the court and the MSPB, Respondent never entered her appearance.

## MLRPC 1.3: Diligence

MLRPC 1.3 requires an attorney to "act with reasonable diligence and promptness in representing a client." MLRPC 1.3 can be violated by failing to "advance the client's cause or endeavor," *Attorney Grievance Comm'n v. Smith*, 457 Md. 159, 216 (2018); failing "to investigate a client's matter," *Attorney Grievance Comm'n v. McLaughlin*, 456 Md. 172, 192 (2017); and repeatedly failing "to return phone calls, respond to letters, or provide an accounting for earned fees," *Moore*, 451 Md. at 80. The same rationale that supports a Rule 1.1 violation can support a Rule 1.3 violation. *Attorney Grievance Comm'n v. Mooney*, 359 Md. 56, 94 (2000).

The hearing judge concluded that because Respondent violated MLRPC 1.1, 1.2, and, as we shall see, 1.4, Respondent also violated MLRPC 1.3 in each client matter. Respondent excepts to these conclusions of law by arguing that she performed reasonably when one considers: her illness; that all the matters (except Ms. Houston's) were atypical; and that all of the clients (except Ms. Richardson) were very demanding and had unrealistic expectations.

From our review of the hearing judge's findings of fact, the matters were not

54

atypical, the clients did not demand anything other than reasonable representation and communication, and Respondent's illness is exaggerated. Thus, we overrule Respondent's exceptions and hold that she violated Rule 1.3 in each client matter.

### MLRPC 1.4(a) and (b): Communication

MLRPC 1.4 requires attorneys to communicate with their clients and keep their clients reasonably informed of the status of their case. A failure to communicate the status of a case prevents the client from making informed decisions. *Attorney Grievance Comm'n v. Shapiro*, 441 Md. 367, 385 (2015). An attorney can also violate MLRPC 1.4 by misrepresenting the status of a case. *Id.*; *see also Attorney Grievance Comm'n v. Sperling*, 432 Md. 471, 494 (2013) (concluding that an attorney violated Rule 1.4 by telling his client that he was pursuing the client's case when the case had been dismissed).

The hearing judge concluded that Respondent "failed to keep Ms. Richardson, Ms. Dyer, Ms. Houston, Ms. Spencer, and Ms. Marigny reasonably informed about the status of their respective cases, . . . did not comply with their reasonable requests for information . . . . [and] failed to explain matters to these clients to the extent reasonably necessary[.]"

In the Richardson matter, Respondent failed to: "communicate . . . for long periods of time despite requests for information[;]" explain the demand letters she sent; and explain her inability to schedule arbitration. Moreover, Respondent misrepresented that she was working on Ms. Richardson's case, which prevented Ms. Richardson from knowing whether to retain other counsel.

In the Dyer matter, Respondent failed to: respond to multiple messages for months at a time; inform Ms. Dyer that Walmart had denied liability for her injuries; and inform

Ms. Dyer that the statute of limitations in Tennessee had run.

In the Houston matter, Respondent failed to: provide Ms. Houston a copy of a motion that she had requested; explain adequately when the motions for recusal and modification would be filed; provide invoices; and explain her illness.

In the Spencer matter, Respondent failed to: respond to requests for information; advise Ms. Spencer regarding Respondent's failure to respond to discovery requests; inform Ms. Spencer about the order for sanctions; promptly inform Ms. Spencer about Respondent's failure to appear at a hearing; inform Ms. Spencer regarding her case's dismissal; provide invoices; and explain her illness.

In the Marigny matter, Respondent failed to: respond to requests for information; provide invoices; advise that she would take no further action in the EEOC matter; inform Ms. Marigny that she did not attend a hearing; inform Ms. Marigny that she did not file a response to the show cause order; and explain her illness.

Respondent excepts to each conclusion, stating, "Rule 1.4 does not require that a Maryland lawyer respond to each and every event in a client's case." It is true that Rule 1.4 violations are based on substance rather than regularity, *see Attorney Grievance Comm'n v. Rand*, 445 Md. 581, 608 (2015), but Respondent's failure to communicate permeates each complaint against her and includes her failures to inform clients that their cases were dismissed, a continuance had been sought, discovery requests were made, a statute of limitations had run, and an order of sanctions had been issued. Consequently, we reject Respondent's contention that her failures to communicate in each case were trivial. We therefore conclude that Respondent violated Rule 1.4 in connection with all of

56

the client matters before us.

## MLRPC 1.5(a): Fees

MLRPC 1.5 directs that the fees an attorney charges must be reasonable. For the fees to be reasonable, they must be "commensurate with the legal services provided." *Bellamy*, 453 Md. at 397. Thus, a reasonable fee at the outset of a representation "can become unreasonable if the lawyer fails to earn it." *Attorney Grievance Comm'n v. Garrett*, 427 Md. 209, 224 (2012).

The hearing judge found that the fees Respondent charged Ms. Spencer and Ms. Marigny were unreasonable because Respondent "provided little to no services" to Ms. Spencer and "abandoned [Ms. Marigny's] case before accomplishing any of the objectives set out in the retainer agreement." Based on those findings, the hearing judge concluded that Respondent violated Rule 1.5 in both the Spencer and Marigny matters.

Respondent excepts to this conclusion and argues that "[r]easonableness of the legal fee is not dependent on the success of the case." The hearing judge's conclusions rested on Respondent's failure to take any meaningful action in those legal matters, not the success of those matters. We agree with the hearing judge and conclude that Respondent violated Rule 1.5.

## MLRPC 1.15(a): Safekeeping Property

MLRPC 1.15(a) requires attorneys to maintain their clients' property, including money held in trust, in safekeeping. Attorneys violate Rule 1.15(a) if they deposit their clients' money into their personal or operating account before the money is earned. *Attorney Grievance Comm'n v. Guida*, 391 Md. 33, 53 (2006). Rule 1.15(a) also requires

attorneys to "create and maintain records accounting for client and third-party funds and preserve the records for at least five years after each record was created." *Lang*, 461 Md. at 52.

The hearing judge found that Respondent violated Rule 1.15(a) in the representations of Ms. Houston, Ms. Spencer, and Ms. Marigny by failing to maintain the retainer fees in her attorney trust account until the fees were earned and failing to maintain complete client matter records. Respondent excepts to this conclusion and argues that all fees were earned.

Earlier in this opinion, we overruled Respondent's factual exception that her invoices do not reflect all the work she did for her clients. The record supports the hearing judge's findings of fact and legal conclusions that Respondent, by repeatedly disbursing fees to herself before earning them and then failing to return those unearned fees, violated Rule 1.15(a) in the Houston, Spencer, and Marigny matters.

### MLRPC 1.16(a) and (d): Terminating Representation

Attorneys violate MLRPC 1.16(a) if they fail to withdraw from representation once "their interests become 'untenably at odds with [their] client[s'].'" *Shapiro*, 441 Md. at 392 (quoting *Bleecker*, 414 Md. at 173). This includes when an attorney's mistake gives rise to a potential cause of action against the attorney. *See Attorney Grievance Comm'n v. Pennington*, 387 Md. 565, 581 (2005). Rule 1.16(a) is also violated if the attorney fails to withdraw from the representation when the attorney can no longer represent a client due to a physical condition. *Lee*, 393 Md. at 567.

MLRPC 1.16(d) is violated when an attorney fails to return unearned fees and

papers. *Attorney Grievance Comm'n v. Moore*, 447 Md. 253, 269 (2016); *see also Kremer*, 432 Md. at 336.

The hearing judge concluded that Respondent violated MLRPC 1.16(a) with respect to Ms. Spencer and Ms. Marigny and MLRPC 1.16(d) with respect to Ms. Houston, Ms. Spencer, and Ms. Marigny.

Respondent excepts to the MLRPC 1.16(a) conclusions, arguing that she was discharged before being able to "get geared up in the case" or before "ha[ving] the opportunity to correct" an earlier mistake. She also takes exception to the conclusion that she violated MLRPC 1.16(d) by failing to return client files. She argues that the delay was due to her illness and because she turned over all client files to Petitioner during the investigation.

Respondent's averment that she simply needed more time to get geared up in Ms. Spencer's case is without merit. Respondent used her illness to delay Ms. Spencer's case for close to a year, notwithstanding that the record reflects that throughout the year she had ample time to advance the case. Moreover, Respondent was hospitalized five times for a total of forty-two days over the year-long representation, which included multiple motions for continuances, a failure to provide discovery, failure to attend a hearing, an order for sanctions, and ultimately, a dismissal of her client's case. Respondent should have realized that she could no longer represent Ms. Spencer well before the case was dismissed. As a result, Respondent violated MLRPC 1.16(a).

We similarly reject Respondent's illness as an excuse for her failure to return Ms. Spencer's client file. Her representation of Ms. Spencer concluded in January 2016; yet

for two years thereafter, Respondent did not return Ms. Spencer's client file. Therefore, Respondent violated MLRPC 1.16(d).

In Ms. Marigny's case, the representation was limited to a few months, but the first month coincided with Respondent's claim to be seriously ill in Ms. Spencer's case. The hearing judge found that Respondent should have been aware from her experience representing Ms. Spencer that she was not able to represent Ms. Marigny. Moreover, when Ms. Marigny asked for her client file, Respondent failed to return it in a timely manner, forcing Ms. Marigny to proceed *pro se* and without her file. It is unclear if Ms. Marigny ever received her client file. Respondent's illness and sporadic hospitalizations do not justify the delay in this matter. Hence, Respondent violated Rule 1.16(a) and (d).

Ms. Houston requested her client file in August 2014. Respondent failed to return the file until January 2015. Once again, Respondent's illness is not an adequate justification for the delay. We therefore conclude that Respondent violated Rule 1.16(d) by failing to return the file promptly and failing to maintain a complete record in Ms. Houston's matter.

**MLRPC 3.4(c) and (d): Fairness to Opposing Party and Counsel**

Rule 3.4(c) prohibits attorneys from "knowingly disobey[ing] an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists[.]" An attorney violates Rule 3.4(c) if he or she "'repeatedly fail[s] to appear in court and to produce documents as directed by court order.'" *Attorney Grievance Comm'n v. Dyer*, 453 Md. 585, 668 (quoting *Attorney Grievance Comm'n v. Mininsohn*, 380 Md. 536, 570 (2004)), *cert. denied*, 138 S. Ct. 508 (2017). Rule 3.4(d) requires an

attorney to make a "reasonably diligent effort to comply with a legally proper discovery request by an opposing party[.]"

The hearing judge concluded that Respondent violated MLRPC 3.4(c) and (d) in Ms. Marigny's case and Ms. Spencer's case. These violations were based on Respondent's failure to appear at hearings, failure to enter her appearance, and failure to respond to discovery requests. Respondent excepts to the judge's conclusion by pointing to her earlier exceptions, claiming that she did not enter her appearance in Ms. Marigny's EEOC action because the claim was meritless and because she was ill during most of Ms. Spencer's representation.

Having already overruled these factual exceptions, we conclude that Respondent's failures listed above constitute violations of Rule 3.4(c) and (d).

## MLRPC 8.1(b): Bar Admissions and Disciplinary Matters

MLRPC 8.1(b) is violated if an attorney fails to respond to Bar Counsel's lawful request for information. "The rule does not distinguish between attorneys who fail to respond to lawful demands due to dilatoriness, on the one hand, and those on the other hand, who intentionally fail to respond." *Attorney Grievance Comm'n v. Weiers*, 440 Md. 292, 304 (2014). Moreover, "[b]elated participation in a Bar Counsel investigation does not overcome a violation of failing to respond to Bar Counsel in the first instance." *Attorney Grievance Comm'n v. Wills*, 441 Md. 45, 56 (2014) (citation omitted).

The hearing judge concluded that Respondent violated MLRPC 8.1(b) by failing to reply to Bar Counsel's requests for information. The hearing judge rejected, as have we, that Respondent's failure is excused because she was "hampered by her illness and the

failure of her virtual office to forward her correspondence in a timely fashion." Respondent also asserts that once she became aware of the investigation, she cooperated "ever since and throughout trial."

Even if we were to assume for the sake of argument that Respondent cooperated once she knew of the investigation, which she did not, her later replies would not excuse her earlier failures to do so. *See, e.g.*, *Attorney Grievance Comm'n v. Fezell*, 361 Md. 234, 253 (2000) ("[H]is belated cooperation with Bar Counsel does not excuse Respondent's failure to respond to the previous five letters sent by Bar Counsel."). Thus, Respondent violated Rule 8.1(b).

### MLRPC 8.4: Misconduct

MLRPC 8.4(a) is violated if any rule under the MLRPC is violated. MLRPC 8.4(c) is violated if an attorney "engage[s] in conduct involving dishonesty, fraud, deceit or misrepresentation[.]" If an attorney makes false statements to Bar Counsel during an investigation, he or she violates Rule 8.4(c). *Attorney Grievance Comm'n v. Dominguez*, 427 Md. 308, 324 (2012). Generally, MLRPC 8.4(d) is violated "when [an attorney's] conduct impacts negatively the public's perception or efficacy of the courts or legal profession." *Attorney Grievance Comm'n v. Barnett*, 440 Md. 254, 267 (2014) (citation omitted). Misconduct that constitutes a violation of 8.4(c) may also violate 8.4(d). *Attorney Grievance Comm'n v. Worsham*, 441 Md. 105, 129-30 (2014).

The hearing judge determined that, in each client representation, Respondent violated MLRPC 8.4(c) when she took fees prior to earning them and then retained the unearned fees after the representations had ended. The hearing judge further concluded

that Respondent violated Rule 8.4(c) when Respondent:

> (1) intentionally misled Ms. Richardson, Ms. Dyer, Ms. Spencer, and Ms. Marigny that she would continue to work on their cases and that there was no need for concern when she was either unwilling or unable to continue with the representation; (2) made a knowing and intentional misrepresentation to Ms. Dyer stating that a lawyer in Arkansas was filing her lawsuit when that in fact was not true; (3) provided a false invoice to Ms. Houston including misrepresentations that she had performed work that had never been started or completed and misrepresented the date on which she withdrew Ms. Houston's funds from her attorney trust account; [4] that she [misrepresented that she] was working on the motions; (5) intentionally misrepresent[ed] to Ms. Spencer that she was suspending her practice on January 5, 2016; (6) intentionally misrepresent[ed] to Ms. Marigny that she would continue to work on her case and "catch up" on the MSPB and EEOC matters when the Respondent was either unwilling or unable to continue with the representation.

(Footnotes omitted).

Respondent excepts to the hearing judge's conclusion that she retained unearned fees in all her client matters. Specifically, she argues that in the Richardson matter and in the Dyer matter, she received no fee. In the other matters, Respondent maintains that she earned the fees, which we have rejected.

We sustain Respondent's exception that she did not retain unearned fees in the Richardson and Dyer matter, as there is no indication that Ms. Richardson or Ms. Dyer ever paid Respondent. We, however, overrule the remainder of Respondent's exceptions (her illness; no opportunity to take corrective steps; overly demanding clients) for reasons already stated, and uphold the hearing judge's conclusion that Respondent violated Rule 8.4(c).

The hearing judge also concluded that Respondent violated MLRPC 8.4(d) by failing to "provide prompt and complete responses to Bar Counsel in all six complaints in

this matter"; failing to keep her clients apprised of the status of their legal matters; failing to represent her clients diligently; failing to inform her clients of her illness; failing to return client files; and misrepresenting that she was working on their cases. We agree with the hearing judge that these failures, as well as Respondent's violations of MLRPC 8.4(c), constitute violations of MLRPC 8.4(d). *See Attorney Grievance Comm'n v. Brigerman*, 441 Md. 23, 40 (2014) (concluding respondent violated Rule 8.4(d) by "repeatedly fail[ing] to respond in a timely manner to Bar Counsel's inquiries"); *Attorney Grievance Comm'n v. Thomas*, 440 Md. 523, 555 (2014) ("Violations of MLRPC 8.4(d) may occur when attorneys fail to keep their clients advised of the status of their representation or, more grievously, fail to represent diligently their clients."); *Attorney Grievance Comm'n v. Fader*, 431 Md. 395, 435 (2013) (misrepresentation about illness can be a violation of 8.4(d)); *Attorney Grievance Comm'n v. Smith*, 442 Md. 14, 31 (2015) (stating that "a repeated failure to communicate with clients (or others) that impairs the discharge of the attorney's duties"—in this case, the duty under 1.16(d) to reply to requests to return a client's files after termination—violates Rule 8.4(d)); *Attorney Grievance Comm'n v. Reinhardt*, 391 Md. 209, 222, 225 (2006) (finding an 8.4(d) violation when a lawyer told a client he was working on her case even though he had actually lost her file, stating "[it] goes without saying that a lawyer should not lie to the client about the status of the client's case").

Lastly, the hearing judge concluded that Respondent violated MLRPC 8.4(a) in her representation of Ms. Richardson, Ms. Dyer, Ms. Houston, Ms. Spencer, and Ms. Marigny. Based on the violations discussed above, we agree with that conclusion and therefore

overrule Respondent's exception.

## Aggravating Factors and Mitigating Factors

The respondent in an attorney disciplinary proceeding must prove the presence of mitigating circumstances by a preponderance of the evidence. *Attorney Grievance Comm'n v. Joseph*, 422 Md. 670, 695 (2011). Bar Counsel has the burden of proving the existence of aggravating factors by clear and convincing evidence. *Thompson*, 462 Md. at 131.

We have recently enumerated the aggravating factors upon which we rely, in part, to determine the appropriate sanction:

> (1) prior attorney discipline; (2) a dishonest or selfish motive; (3) a pattern of misconduct; (4) multiple violations of the MLRPC; (5) bad faith obstruction of the attorney discipline proceeding by intentionally failing to comply with the Maryland Rules or orders of this Court or the hearing judge; (6) submission of false evidence, false statements, or other deceptive practices during the attorney discipline proceeding; (7) a refusal to acknowledge the misconduct's wrongful nature; (8) the victim's vulnerability; (9) substantial experience in the practice of law; (10) indifference to making restitution or rectifying the misconduct's consequences; (11) illegal conduct, including that involving the use of controlled substances; and (12) likelihood of repetition of the misconduct.

*Attorney Grievance Comm'n v. Sperling*, 459 Md. 194, 275 (2018) (citation omitted).

The hearing judge found that the following aggravating factors were present: Respondent exhibited a dishonest and selfish motive; engaged in a pattern of misconduct; committed multiple violations; acted in bad faith obstruction of Bar Counsel's investigation; used her illness as a defense in a deceptive way; and refused to acknowledge the wrongfulness of the misconduct. In addition, the victims, by Respondent's own admission, were vulnerable; Respondent is an experienced attorney; she refused to refund

65

unearned fees or remedy the adverse consequences her inactions caused in her clients' matters; and it is likely Respondent would repeat the misconduct.

Respondent takes exception with almost every one of the hearing judge's findings. We overrule each exception.

Respondent's premature disbursal of unearned fees and retention of those unearned fees after her representations ended is demonstrative of her selfish motive. The pattern-of-misconduct and multiple-violations factors are supported by Respondent's repeated neglect and abandonment of her clients. Respondent's bad faith obstruction in Bar Counsel's investigation is evident from Bar Counsel's numerous unsuccessful attempts to obtain responses to the six complaints. Respondent's use of her illness was deceptive. Respondent's own testimony illustrates that she was an experienced attorney. Since her admission to the Maryland Bar in 2007, Respondent has handled EEOC claims for "[f]ive or six years"; MSPB claims for "five years . . . or so"; and over 100 other civil litigation cases. Respondent refuses to acknowledge that her inaction constituted misconduct and maintains that her conduct was reasonable given her illness, her overly-demanding clients, and the "atypical" nature of the cases—all assertions that we have rejected. Lastly, the likelihood of Respondent repeating her misconduct is apparent from her continued misconduct even after she was notified of the complaints filed against her.

> We have recognized the following mitigating factors:
>
> (1) the absence of prior attorney discipline; (2) the absence of a dishonest or selfish motive; (3) personal or emotional problems; (4) timely good faith efforts to make restitution or to rectify the misconduct's consequences; (5) full and free disclosure to the Commission or a cooperative attitude toward the attorney discipline proceeding; (6) inexperience in the practice of law;

(7) character or reputation; (8) a physical disability; (9) a mental disability or chemical dependency, including alcoholism or drug abuse, where: (a) there is medical evidence that the lawyer is affected by a chemical dependency or mental disability; (b) the chemical dependency or mental disability caused the misconduct; (c) the lawyer's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and (d) the recovery arrested the misconduct, and the misconduct's recurrence is unlikely; (10) delay in the attorney discipline proceeding; (11) the imposition of other penalties or sanctions; (12) remorse; (13) remoteness of prior violations of the MLRPC; and (14) unlikelihood of repetition of the misconduct.

*Sperling*, 459 Md. at 277-78 (citation omitted).

The hearing judge found only that Respondent had established by a preponderance of the evidence the absence of a disciplinary record. Respondent takes issue with the absence of a finding that her illness was a mitigating factor.

To establish her illness as a mitigating factor for such egregious violations of the MLRPC, Respondent needed to show the illness was the "root cause" of her misconduct. *Vanderlinde*, 364 Md. at 413-14; *accord Attorney Grievance Comm'n v. Patton*, 432 Md. 359, 382 (2013); *Guida*, 391 Md. at 56. As stated above, however, Respondent's use of her illness was disingenuous. Because she is unable to establish that her illness caused her misconduct, we reject it as a mitigating factor.

The hearing judge did not find that Respondent had good character. She excepts, arguing that she presented character witnesses that testified to that effect. The hearing judge is free to pick and choose what testimony on which to rely. *Attorney Grievance Comm'n v. Hodes*, 441 Md. 136, 181 (2014). In this case, he chose to credit, but not rely, on Respondent's witnesses, and instead to rely on the testimony of Respondent's clients. We find no fault with the hearing judge's decision, and consequently overrule

67

Respondent's exception.

The remaining exceptions have either already been overruled (that Respondent committed no misconduct, her actions were reasonable, that Respondent was a sole practitioner with limited training in operating a firm) or are non-determinative. Respondent's exceptions also largely rely on her own testimony, which was deemed not credible. We therefore overrule her remaining exceptions.

## V.

### The Sanction

We are left only to decide the appropriate sanction. "'[W]e are guided by our interest in protecting the public and the public's confidence in the legal profession.'" *Attorney Grievance Comm'n v. Phillips*, 451 Md. 653, 677 (2017) (quoting *Attorney Grievance Comm'n v. Lewis*, 437 Md. 308, 329 (2014)). As a result, "our purpose in deciding the appropriate sanction is not to punish the lawyer, but to protect the public, and 'deter other lawyers from engaging in similar misconduct.'" *Id.* (quoting *Attorney Grievance Comm'n v. Pennington*, 387 Md. 565, 596 (2005)). When determining the appropriate discipline, we consider the facts and circumstances of each case and order a sanction that is "commensurate with the nature and gravity of the violations and the intent with which they were committed." *Butler*, 441 Md. at 359 (citation omitted).

Disbarment is the appropriate sanction for Respondent's numerous and severe violations of the MLRPC. Among other violations, Respondent neglected and abandoned clients; made numerous misrepresentations to clients, opposing counsel, Bar Counsel, and the courts; and knowingly misappropriated funds.

68

Respondent's pattern of dishonesty in and of itself warrants disbarment. *Attorney Grievance Comm'n v. Peters-Hamlin*, 447 Md. 520, 547-49 (2016) ("disbarment is ordinarily the sanction for intentional dishonest conduct"); *see also Vanderlinde*, 364 Md. at 418. Respondent's neglect of client affairs, including her failure to communicate with her clients or respond to Bar Counsel, also independently warrants disbarment. *Attorney Grievance Comm'n v. Mitchell*, 445 Md. 241, 263 (2015); *Attorney Grievance Comm'n v. Thomas*, 440 Md. 523, 558 (2014) (collecting cases). The lack of prior discipline does not preclude disbarment. *See, e.g.*, *Attorney Grievance Comm'n v. Brady*, 422 Md. 441, 461 (2011); *Attorney Grievance Comm'n v. Tinsky*, 377 Md. 646, 655 (2003); *Attorney Grievance Comm'n v. Wallace*, 368 Md. 277, 293 (2002).

Considering the numerous violations of the MLRPC, in conjunction with the mitigating and aggravating factors discussed above, we disbar Respondent.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 19-709, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST CHRISTAL ELIZABETH EDWARDS.**